George RAMSEY et al., Plaintiffs-
Appellants,

v.

UNITED MINE WORKERS OF
AMERICA, Defendant-Appellee.

TENNESSEE PRODUCTS & CHEMICAL
CORPORATION, Plaintiff-Appellant,

v.

UNITED MINE WORKERS OF
AMERICA, Defendant-Appellee.

Nos. 17878, 17879.

United States Court of Appeals
Sixth Circuit.

Sept. 26, 1969.

Edward L. Carey, Harrison Combs, Willard Owens, Washington, D. C., E. H. Rayson, Knoxville, Tenn., M. E. Boiarsky, Charleston, W.Va., for appellee.

John A. Rowntree, Knoxville, Tenn., Van Deveer, Brown, Siener & Walker, Sizer Chambliss, Chattanooga, Tenn., A. Allan Kelly, Kelly & Cameron, William M. Ables, Jr., South Pittsburg, Tenn., for appellants.

Before PHILLIPS, Chief Judge, and WEICK, O'SULLIVAN, EDWARDS, CELEBREZZE, PECK, McCREE and COMBS, Circuit Judges.

## ON REHEARING EN BANC

PER CURIAM.

After consideration of these appeals by a panel of this court, rehearing en banc was granted. Upon rehearing, the court was evenly divided as to affirmance or reversal of the District Court. Accordingly, the judgment of the District Court stands affirmed. The opinions of Judge EDWARDS for affirmance and Judge O'SULLIVAN for reversal, respectively are filed with this order.

EDWARDS, Circuit Judge, with whom PHILLIPS, Chief Judge, and PECK and COMBS, Circuit Judges, concur. These cases are on appeal from judgments entered in the United States District Court for the Eastern District of Tennessee, Southern Division, which dismissed the joint complaints of plaintiffs-appellants coal operators against

defendant-appellee United Mine Workers.

They are the latest appeals in this circuit which present the conflicts between the national policy opposing trusts and monopolies (Sherman Antitrust Act §§ 1 and 2, 15 U.S.C. §§ 1, 2 (1964)), and the national policy favoring collective bargaining (National Labor Relations Act § 1, 29 U.S.C. § 151 (1964); Norris-La-Guardia Act §§ 1, 2 and 5, 29 U.S.C. §§ 101, 102, 105 (1964); Clayton Antitrust Act §§ 6 and 20, 15 U.S.C. § 17 (1964), 29 U.S.C. § 52 (1964)). Plaintiffs are coal operators in southeastern Tennessee who allege that defendant, United Mine Workers of America, entered into a national conspiracy with certain major coal producers to create a monopoly, to suppress competition, and to drive plaintiffs (and other marginal operators) out of business.

At the outset we note that of all the major coal companies, whose economic interests defendant is alleged to have conspired to serve, none were joined as co-defendants at trial.

In all controlling respects the issues presented by these appeals are identical with the major issues in the *Pennington* cases which have been the subject of original trial, judgment, and affirmance by this court, Pennington v. United Mine Workers, 325 F.2d 804 (6th Cir. 1963) reversal and remand by the United States Supreme Court, Pennington v. United Mine Workers, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), retrial and judgment, Lewis v. Pennington, 257 F.Supp. 815 (E.D.Tenn.1966), and affirmance of judgment on retrial by this court, Lewis v. Pennington, 400 F. 2d 806 (6th Cir. 1968), cert. denied, 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444 (1968). The opinions of Justice White in the Supreme Court remand of *Pennington*, of Judge Peck in the latest consideration of *Pennington* by this court, and the opinion of Judge Wilson, who tried these cases without a jury and entered thorough findings of fact and carefully reasoned conclusions of law, Ramsey v. United Mine Workers, 265 F.

Supp. 388 (E.D.Tenn.1967), should serve to foreshorten our appellate consideration.

Appellants present three questions before this court:

1. Does the Sherman Act place any restraints on national collective bargaining?

2. Should the court have found there was an agreement between UMW and BCOA that uniform labor terms would be imposed on all bargaining units throughout the industry?

3. Should the court have concluded that there was an illegal combination or conspiracy between UMW and business groups, even if the proof were insufficient to establish a specific agreement to apply uniform terms industry-wide?

Only the last two of these questions are pertinent to decision of the instant appeals. And we decline the invitation to write an advisory opinion on the first question seeking to interpret or expand on the views of the United States Supreme Court, as particularly expressed in Pennington v. United Mine Workers, 381 U.S. 657, 85 S.Ct. 1585 (1965); Allen Bradley Co. v. Local 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), and United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941).

The second issue requires us to determine whether or not the Supplemental Agreement of 1958 (the Protective Wage Clause) between the Bituminous Coal Operators Association (BCOA) and the United Mine Workers of America (UMW) constituted an express or per se violation of the antitrust laws. The specific language complained of follows:

"PROTECTIVE WAGE CLAUSE

"The United Mine Workers of America (which, as used in this Clause, includes all of its Districts, Local Unions, Officers or Agents) and the Operators signatory hereto affirm their intention to maintain the integ-

rity of this contract in all of its parts. The objective of this contract is to provide the maximum possible continuity and stability of employment under the conditions set forth herein. The parties hereto agree that bituminous coal mines shall be so operated as not to debase or lower the standards of wages, hours, safety requirements and other conditions of work, established by this contract. The parties recognizing their obligation each as to the other to exercise all possible efforts and means to attain these objectives further agree as follows:

"A. During the period of this Contract, the United Mine Workers of America will not enter into, be a party to, nor will it permit any agreement or understanding covering any wages, hours or other conditions of work *applicable to employees covered by this Contract* on any basis other than those specified in this Contract or any applicable District Contract. The United Mine Workers of America will *diligently perform and enforce* without discrimination or favor the conditions of this paragraph and all other terms and conditions of this Contract and will use and exercise its continuing best efforts to obtain full compliance therewith by each and all the parties signatory thereto.

"B. It is recognized that *when signatory operators* mine, prepare, or procure or acquire under subcontract arrangements, bituminous coal mined under terms and conditions less favorable than those provided for in this contract, they deprive employees of employment opportunities, employment conditions and other benefits which these employees are entitled to have safeguarded, stablized and protected. Accordingly, the Operators agree *that all bituminous coal mined, produced, or prepared by them, or any of them, or procured or acquired by them or any of them under a subcontract arrangement,* shall be or shall have been mined or produced under terms and conditions which are as fa-

vorable to the employees as those provided for in this Contract.

" 'Procured or acquired under a subcontract arrangement' means any contract, lease, license, agreement, arrangement or understanding pursuant to which the signatory operator acquires coal, either as principal or agent, directly or indirectly from a producer other than such signatory for delivery to a person. other than such signatory.

"The obligation assumed hereunder shall not affect any agreement in effect as of the date of execution of this contract: Provided, however, that any operator signatory hereto who is a party to any agreement inconsistent with the obligations assumed hereunder shall not maintain such inconsistent agreement in effect beyond the first date at which such agreement may be terminated by him in accordance with its terms.

"The Operators signatory to this agreement shall so conduct their own operations (whether operated directly or indirectly, or through subsidiaries or affiliates) so as to fully comply with their obligations under this Clause. The obligation of each Operator signatory hereto, which is several and not joint, to fully perform all the conditions in this paragraph B contained, shall be a direct and continuing obligation of said Operator during the life of this Agreement.

"As a part of the consideration for this Agreement, the Operators signatory hereto agree that *this Clause covers the operation of all the coal lands, coal producing or coal preparation facilities owned or held under lease by them, or any of them, or by any subsidiary or affiliate at the date of this Agreement, or acquired during its term which may hereafter (during the term of this Agreement) be put into production or use.* The said Operators agree that they will not lease, license, or contract out any coal lands, coal producing or coal preparation fa-

cilities as a subterfuge for the purpose of avoiding the application of this Clause." (Emphasis added.)

Defendant sought to persuade the District Court, and now seeks to persuade us, that this language taken in the historic context of the bargaining relationship constitutes an express undertaking by defendant to impose the BCOA-UMW wage scale on all nonsignatory coal operators in order to force some (including plaintiffs) out of business.

We simply do not find language to support this contention. The italicized portions of the disputed agreement clearly indicate that it is expressly limited in its effect to its signatories.

Further, as Judge Peck recently pointed out for this court:

"[W]e agree with the District Court that the disputed Protective Wage Clause, properly construed, did not require the Union to impose the wages therein contained on the nonsignatory employers. The Protective Wage Clause is capable of two reasonable constructions, and the District Court properly held that in such circumstances the construction should be adopted that does not result in a violation of law. Great Northern Railway Co. v. Delmar Co., 283 U.S. 686, 51 S. Ct. 579, 75 L.Ed. 1349 (1931); Perry Coal Co. v. N.L.R.B., 284 F.2d 910, 914 (7th Cir. 1960). We add the observation, however, that even without the operation of this principle of law we would incline to the conclusion that the agreement did not constitute a violation of the Sherman Act, the record containing insufficient evidence from which a conspiracy or other violation could be found to have been clearly shown." Lewis v. Pennington, *supra* 400 F.2d at 814–815.

The third appellate issue is, however, such as to require greater analysis. In it plaintiffs-appellants contend that even if defendant did not make an express commitment in contractual language, it did in fact form an illegal conspiracy · with BCOA to impose a wage scale upon the total industry which had the effect (and if such were needed, the predatory intent also) of driving smaller operators like plaintiffs out of business.

There is, of course, no doubt that defendant could in serving the purposes of its membership seek vigorously to impose a uniform wage scale throughout the coal industry and that in doing so its lawful labor objectives were exempt from antitrust regulation. *See* American Federation of Musicians, etc. v. Carroll, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968).

In United States v. Hutcheson, 312 U. S. 219, 61 S.Ct. 463 (1941), the Supreme Court said:

"So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness the selfishness or unselfishness of the end of which the particular union activities are the means. *Id.* at 232, 61 S.Ct. at 466. (Footnote omitted.)

*See also* Clayton Act § 20, 29 U.S.C.A. § 52, and Norris-LaGuardia Act, 18 U.S.C. § 3692, 29 U.S.C. §§ 101–115 (1964); Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940).

The critical questions pertaining to this issue are 1) whether defendant acted in its' own self-interest or whether defendant acted in illegal conspiracy with BCOA to stifle competition; and 2) by what standard of proof this decision should be made.

One major difference between the appellate record in *Pennington* and that presented herein must be pointed out here. Both District Judges (Judge Taylor in the retrial of the *Pennington* case, and Judge Wilson in *Ramsey*) concurred in holding that the standard of proof imposed upon plaintiffs in establishing its allegations of antitrust conspiracy against defendant labor union was "clear proof" rather than "preponderance of the evidence." Judge Taylor,

however, stated that on the record before him plaintiffs' proofs failed to justify judgment under either standard; whereas in the instant record Judge Wilson said:

"Having concluded that the Protective Wage Clause does not constitute an express commitment upon the part of the U.M.W. to the B.C.O.A. not to bargain with any other coal operator upon any terms other than the national contract, this does not conclude the issue of whether the U.M.W. did in fact, though not expressly, so contract with B.C.O.A. *Were this case being tried upon the usual preponderance of the evidence rule applicable to civil cases, the Court would conclude that the U.M.W. did so impliedly agree. However, the standard of proof where a labor union is involved is 'clear proof', as required by Section 6 of the Norris-LaGuardia Act, a standard different from the ordinary civil burden of persuasion.* United Brotherhood of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973; United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. The Court is of the opinion that the evidence upon the record in this case does not establish such clear and unequivocal proof as to warrant the Court in finding that the U.M.W. pursued its policy of uniformity of wage and labor standards by agreement with one or more employers, as distinguished from pursuing such policy upon its own. The only direct evidence in the record is to the effect that the Union pursued such policy upon its own, and not in agreement with any employer." Ramsey v. United Mine Workers of America, 265 F.Supp. 388, 412 (E.D.Tenn.1967). (Emphasis added.)

In the second *Pennington* case Judge Peck dealt with these identical issues:

"Plaintiffs' principle contention is that the UMW, in combination with the BCOA, agreed to impose the wage and royalty scales set forth in the National Agreement upon all operators regardless of their ability to pay. One issue presented is whether the District Court properly held 'that the *Pennington* case teaches that it is necessary to find predatory intent to drive small coal operators out of business in order to hold the employer and Union for a violation of the Sherman Act.'

"In *Pennington* the Supreme Court, in an opinion by Mr. Justice White and joined by Mr. Chief Justice Warren and Mr. Justice Brennan, stated:

'We have said that a union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers. No case under the anti-trust laws could be made out on evidence limited to such behavior. But we think a union forfeits its exemption from the antitrust laws when it is *clearly shown* that it has agreed with one set of employers to impose a certain wage scale on other bargaining units.' 381 U.S. at 665, 85 S.Ct. at 1591. (Footnote omitted; emphasis added.)

As reflected by the Court's language immediately following the above statement, it appears that Mr. Justice White considered such an agreement to be tantamount to an agreement to eliminate competition:

'One group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy. This is true even though the union's part in the scheme is an undertaking to secure the same wages, hours or other conditions of employment from the remaining employers in the industry.' *Id.* at 665–666, 85 S.Ct. at 1591.

Justice White thus says in effect that if a union and some employers conspire to eliminate some or all of the employers' competition, this is a viola-

tion of the Sherman Act even if the mechanism is the imposition of a wage scale which the union is free unilaterally to impose. It was upon this premise (that the purpose of the bargaining agreement was to drive some employers out of business), that Mr. Justice Douglas, joined by Justices Black and Clark, concurred:

'On the new trial the jury should be instructed that if there was an industry-wide collective bargaining agreement whereby employers and the union agreed on a wage scale that exceeded the financial ability of some operators to pay and that if it was made for the purpose of forcing some employers out of business, the union as well as the employers who participated in the arrangement with the union should be found to have violated the antitrust laws.' 381 U.S. at 672–673, 85 S.Ct. at 1595.

"In view of the two opinions in which a majority of the justices joined, it is here determined that the District Court's holding was correct. That court's interpretation of *Pennington* is in accord with the principle announced in United States v. Hutcheson, *supra* (that a union must act in furtherance of its own self-interest in order to retain immunity from the antitrust laws), and reaffirmed in Allen Bradley Co. v. Local No. 3, *supra*. We thus understand *Pennington* to teach that:

1) a conspiracy between employers and labor formed with the intention of driving competitors out of business is a violation of the Sherman Act;

2) 'predatory intent' (as used by Mr. Justice White (381 U.S. at 668) and by Judge Taylor) is merely shorthand, employed to describe this anti-competitive conspiracy; and

3) such anti-competitive conspiracy must be established by 'clear proof'. See also United Mine Workers v.

Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

"While the jury by its verdict in the first trial of this case had found a conspiracy between the UMW and large mine operators to put smaller mine operators out of business by a preponderance of the evidence, Judge Taylor found such a conspiracy not to have been shown by 'clear proof' at the second trial. Judge Taylor properly concluded that a degree of proof less than the 'beyond a reasonable doubt' requirement in criminal cases but greater than the 'preponderance of the evidence' standard of civil actions is necessary. 257 F.Supp. at 829. The District Court's determination that judged by this standard evidence of sufficient probity had not been offered is supported by a review of the record and is not clearly erroneous. Rule 52 F.R.Civ.P." Lewis v. Pennington, 400 F.2d *supra* at 813–814.

■ We have previously noted that certiorari has recently been denied by the Supreme Court in relation to the second *Pennington* case from this court, which we have just quoted so fully. While we are well aware that denial of certiorari does not represent affirmance, we consider it inappropriate to discount completely the denial of certiorari in second *Pennington*. The Supreme Court had granted certiorari in relation to this court's first decision in the same case and had remanded it with instructions for retrial. If the trial court, or this court, had interpreted those instructions erroneously in the course of retrial or appeal, we find it difficult to believe that the Supreme Court would have ignored the error.

■ We believe that Judge Peck (and Judges Wilson and Taylor) were right in holding that the "clear proof" standard of the Norris-LaGuardia Act is the proper standard of proof applicable to a Sherman Act suit against a labor union. United Brotherhood of Carpenters v.

United States, 330 U.S. 395, 67 S.Ct. 775 (1947); United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130 (1966).

The Norris-LaGuardia Act states specifically:

> "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." Norris-LaGuardia Act § 6, 29 U.S.C. § 106 (1964).

■ It is, of course, impossible for a labor union to act except by dint of actions of its officers, members, or agents. Even more specifically pertinent to the standard of proof applicable to this case is the fact that this action is a claim of violation of the Sherman Antitrust Act by an illegal conspiracy to drive plaintiffs out of business on the part of the United Mine Workers. Such a conspiracy could obviously be carried out only by officers, members, or agents of the union acting in an agency relationship.

There is, of course, no doubt that the agreement between the UMW and the BCOA containing the Protective Wage Clause was the action of fully authorized agents. Defendant UMW concedes this and as to this phase of the case, the standard of proof whether "clear proof" or "preponderance of the evidence" would make no difference.

■ But Judge Wilson found, and we have found, that the language of the agreement did not per se constitute an illegal conspiracy. Plaintiffs also charged, however, that such a conspiracy could be appropriately implied by the District Court from the BCOA-UMW contract, plus the subsequent actions of the UMW officers and members in the organizational and strike activities in the Southeastern Tennessee coalfields and in defendant's purchase of stock in West Kentucky Coal about which plaintiffs-appellants complain. The history and the specific language of the Norris-LaGuardia Act indicate that its "clear proof" standard was designed to apply to just such charges as these.

The United States Supreme Court recognized these facts when it said in the *Carpenters'* case:

> "The indictment charges a conspiracy forbidden by the Sherman Act. On that issue, the power of the trial court is limited by § 6 of the Norris-LaGuardia Act. Note 2, supra [47 Stat. 70, 71]. The limitations of that section are upon all courts of the United States in all matters growing out of labor disputes, covered by the Act, which may come before them. It properly is conceded that this agreement grew out of such a labor dispute and that all parties defendant participated or were interested in that dispute." United Brotherhood of Carpenters and Joiners v. United States, 330 U.S. 395, 401, 67 S.Ct. 775, 778–779 (1947).

Any reconciliation of national labor policy with national antitrust policy demands application of this interpretation in this case. Since in every instance labor unions are seeking agreements with employers on wages, hours and working conditions, and in every such instance both the employer and the union have a strong (albeit separate) motive for extending such agreement to other employers in the same field, it would be simple to defeat the national policy of encouraging collective bargaining by allowing easy implication of union-employer antitrust conspiracies. *See* Mr. Justice Goldberg's dissent in Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen, etc. v. Jewel Tea Co., Inc., 381 U.S. 676, 697, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); *see also* Senate Report No. 163, 72d Cong. 1st Sess., p. 19. Two members of the Supreme Court joined Mr. Justice White's opinion which employed the language, "clearly shown," in describing the applicable standard of proof. 381 U.S. at 665, 85 S.Ct. 1585.

We also read Mr. Justice Douglas' opinion (with which two members joined) as concurring on this point.

Since we agree with this court's second *Pennington* decision (quoted above) that the "clear proof" standard applies to this appeal, we find no reason to undertake an analysis of what result would follow application of a different standard.

Further, in agreement with the reasoning in the second *Pennington* decision in this court, we believe that the Supreme Court[1] in *Pennington* has required a finding of "predatory intent." Such intent may be represented by an agreement by a labor union to serve the interests of an employer in eliminating that employer's economic competition.[2]

With these two standards in mind, we turn to consideration of whether or not plaintiffs' total evidence concerning the alleged antitrust conspiracy constituted "clear proof" of such a conspiracy. As to this issue we deal with a somewhat different factual record than that made in the second *Pennington* case.

The essence of appellants' evidence of conspiracy to drive BCOA's competitors out of business consisted of 1) evidence of UMW attempts to organize the Southeastern Tennessee coalfields, including the operations of appellants; 2) the claimed violent and disastrous economic impact of these activities, and 3) the purchase of substantial stock in the West Kentucky Coal Co. by the UMW and the subsequent "price cutting" activities of West Kentucky Coal which appellants assert served to drive Southeastern Tennessee coal out of the TVA market.

The District Judge's analysis of the evidence he heard is masterly. His opinion covers 52 pages of volume 265 of Federal Supplement and while we affirm it for purposes of our decision on the facts, in view of its ready availability we shall quote from it selectively.

Briefly put, the District Judge found in essence that 1) the UMW in its organizing activities in the Southeastern Tennessee coalfields was pursuing its own and its own members' interests rather than those of the BCOA; 2) appellants' economic troubles stemmed as much (or more) from the geological structures of the Southeastern Tennessee coalfields which made mechanization of the mines to meet oil, gas and electrical competition difficult and from undercapitalization and bad management as they did from the activities of the UMW, and 3) that the total record did not support the charge that defendant conspired with West Kentucky Coal so as to engage in predatory price cutting in the TVA market.[3]

---

1. While Mr. Justice Goldberg and two members of the Court would hold that collective bargaining upon wages and hours is completely free from antitrust restraint (See Justice Goldberg dissenting in Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen, etc. v. Jewel Tea Co., Inc., 381 U.S. 676, 697, 85 S.Ct. 1596 (1965)), this view does not appear to command a majority of the Supreme Court.

2. The United States Supreme Court recently discussed the *Allen Bradley* case and interpreted its holding thus:
   "While recognizing that the union might have had an immunity for its contribution to the trade boycott had it acted alone, citing *Hutcheson, supra,* the Court held immunity was not intended by the Clayton or Norris-LaGuardia

Acts in cases in which the union's activity was part of a larger conspiracy to abet contractors and manufacturers to create a monopoly." National Woodwork Mfrs. Assn. v. NLRB, 386 U.S. 612, 628, 87 S.Ct. 1250, 1260, 18 L.Ed. 2d 357 (1967).

3. We note here that West Kentucky Coal Company was not a defendant in this antitrust conspiracy case as of the time of trial. A stipulation to dismiss it as a defendant had been entered into by plaintiffs. This left the UMW as the only target of this suit alleging an antitrust conspiracy to drive the BCOA's competition out of business. While this fact alone does not justify dismissal of the suit against the UMW, it does seem to cast doubt upon the good faith of the predatory intent aspect of plaintiff's case.

The District Judge's findings on these issues included:

1) "[P]icketing and violence are not per se evidence of a Sherman Act conspiracy. Thus the strike, ratified by the U.M.W., and picketing, to the extent that it received U.M.W. approval, and not the violence unconnected upon the record with the U.M.W., may be looked to as they may or may not demonstrate the purpose of the U.M.W. to conspire with others to impose the National Bituminous Coal Wage Agreement upon the Southeastern Tennessee coal field. The record in this regard fails to show any direct evidence of a Sherman Act conspiracy. Whether such an inference can be drawn must depend upon a review of all of the evidence upon the present phase of the case, to be followed by a review of all of the evidence upon all phases of the case.

"Upon review of the evidence as it relates to the Southeastern Tennessee coal field and of the U.M.W.'s activities therein, the following conclusions appear to be clearly supported by the evidence:

"(1) To operate successfully the producers in the Southeastern Tennessee coal field must be able to compete and survive on the T.V.A. coal market. Since 1954 50% or more of all coal produced in the State of Tennessee has had to find its market with the T.V.A. That figure reached as high as 78% in 1956 and by 1962 was still at 64.3%.

"(2) Due to the geological conditions, the Southeastern Tennessee coal field cannot achieve a level of productivity equivalent to that of its principal competitors on the T.V.A. coal market. This competitive disadvantage is offset in part by the transportation and quality advantages which the field has over its principal competitors in the T.V.A. market at the Widow's Creek steam plant.

"(3) In the period since 1960 the coal operators in the Southeastern Tennessee coal field have been unable to compete and survive in the T.V.A. coal market under the National Bituminous Coal Wage Agreement. While in many instances this appears to have been due to antiquated mining methods and equipment or other causes, the fact nevertheless remains that since 1960 there has not been a single instance of a successful coal mining operation in the Southeastern Tennessee coal field under the National Bituminous Coal Wage Agreement and this in spite of the fact that the only feasible alternative facing most coal operators in the area was to operate under the national contract or go out of business.

"Further than this the Court cannot go. Clear proof does not appear, either directly or by inference, that the U.M.W. acted other than unilaterally in furtherance of its own interests and purposes in its activities in the Southeastern Tennessee coal field in the period here under review. In this regard the plaintiffs rely upon the defendant's advocacy of mechanization as a solution to the operators' competitive difficulties as one element of proof demonstrating a conspiracy, in that the U.M.W. was in fact attempting to force mechanization upon a coal field which it knew to be unsuited by geology therefor and at a rate that the U.M.W. knew was impossible for all but the largest coal operators in the nation. This contention does not appear to accord with the evidence. In the first place, it does not appear that mechanization would be ineffective in rendering the Southeastern Tennessee coal field competitive. Both Allen & Garcia and Grundy Mining Company appear to have been well on the way toward raising productivity to competitive levels by mechanization when their efforts were thwarted or halted by seniority and strike difficulties. In the second place, it does not appear that mechanization is beyond the economic capacity of all but the larger producers on the national scene." Ramsey v. United Mine Workers of

America, 265 F.Supp. 388, 430 (E.D. Tenn.1967).

\* \* \* \* \* \*

"Reviewing the evidence as a whole in this light, the Court is unable to find that the evidence cleary reflects that the plaintiffs were the victims of any conspiracy between the U.M.W. and any coal operators or other non-labor organization to eliminate or suppress competition in the coal industry or to eliminate or suppress the production and sale of coal by the plaintiffs. While many inferences favorable to the plaintiffs' contentions can reasonably be drawn from the evidence, in every instance a no less equally reasonable inference can be drawn to the contrary. The latter, when coupled with the positive denial by many witnesses of any conspiracy, as well as other inferences favorable only to the defendant's contentions, do not permit a finding based upon clear proof of an antitrust conspiracy." 265 F.Supp., *supra* at 432.

2) "The seam of coal in the Southeastern Tennessee coal field, called the Sewanee seam, is located in a mountainous area of the State at an elevation of approximately 1800 feet. It is a rather high grade metalurgical coal. That is, it is usable for making coke for metalurgical purposes. However, the field has certain geological disadvantages. The principal of these is the thinness of the seam. The average thickness of the Sewanee seam appears to vary from 36 to 42 inches, but the seam is highly irregular in this respect. The seam is subject to squeezes and rolls in a very irregular and unpredictable manner; that is, the thickness of the seam varies and these conditions have no pattern. The seam may in one place be squeezed to a matter of a few inches in thickness or may be entirely pinched out by rock. In other places the coal may be rolled into a thickness up to six feet. Hazardous roof conditions are often encountered, especially in the areas of the rolls. The topography of the area is largely mountainous. Accordingly, most mining must be done underground, and the field does not lend itself to strip mining due to excessive overburden except in limited areas.

"These geological conditions place the Southeastern Tennessee coal field at a disadvantage with many other coal fields. For example, whereas only 32% of the coal produced in Tennessee is produced from seams over four feet thick, 65% of the coal comes from seams over four feet thick in the United States as a whole. The irregular nature of the seam, its thinness and difficult roof conditions all pose problems for mechanization.

"Geological conditions are among the matters claimed by the plaintiffs as rendering application of the National Bituminous Coal Wage Agreement to this field economically impossible, and therefore demonstrating the conspiratorial purpose of the U.M.W. in disregarding these conditions and seeking to force the national contract upon the field. This can more appropriately be evaluated after development of the history of the field in its relations with the U.M.W. Suffice it to say at this time that geological conditions have of course been a factor in competition with other coal producing areas and had their effect upon mining practices followed in the Southeastern Tennessee field. However, other conditions largely unrelated to geological conditions have likewise played a part. These include management policies, a general undercapitalization throughout the field, the pyramiding of leases, the nature of the T.V.A. coal market, labor practices and attitudes upon the part of workers and collective bargaining as practiced in the field." 265 F.Supp., *supra* at 424.

3) "Turning first to the activity of West Kentucky (and Nashville) upon the T.V.A. spot market, it is the contention of the plaintiffs that these companies dumped extraordinarily large quantities of coal upon the spot market at steadily declining prices,

particularly during the period from 1956 through 1958, forcing the price from 21.37¢ per million b. t. u. in 1956 down to 16.50¢ per million b. t. u. in 1958. (In translating a b. t. u. price to a tonnage price, the quality of coal is a significant factor. However, on the average one cent per million b. t. u. is equal to approximately 25¢ per ton on a tonnage price basis.) The evidence does not sustain the plaintiffs' charge. Although West Kentucky bid in 1956, its bid in each instance was well above the market and it did not receive a single award. An analysis of the bids in 1957 and 1958 reveals that West Kentucky bid 22 times on the spot market, but received only five awards, these successful bids all being from Nashville Coal Company's Uniontown mine to the T.V.A. Shawnee steam plant. In not a single instance was West Kentucky the low bidder. In the first eight bids it was unsuccessful. On the ninth bid it got an award, but was the highest successful bidder. Its 10th, 11th and 12th bids were unsuccessful. Its 13th bid was successful, but again it was the highest successful bidder. Its 14th and 15th bids were unsuccessful. Its 16th and 17th bids were bid at the same price as the 14th and 15th bids, and were successful this time. In the 16th bid it was the highest successful bidder and in the 17th there were several lower bids. The 18th and 19th bids, at the same price as the four previous bids, were unsuccessful. The 20th bid was successful but was the second highest offer and there were no unsuccessful bidders on this solicitation. The 21st bid, at the same price, was unsuccessful. The 22nd bid was successful, but only by .02 mils per million b. t. u." 265 F.Supp., *supra* at 419.

\* \* \* \* \* \*

"The following table is reconstructed from the record and reflects the bidding of West Kentucky on the T.V.A. term coal market in the period from 1959 through 1963:

| Date of Bid | T.V.A. Requisition # | Price Per Ton (f. o. b. mine) | Evaluated Relation to Other Bids | Award Made |
|---|---|---|---|---|
| 7/27/59 | 27 | $2.90 | 4th from lowest | T-3 |
| 2/ 9/60 | 32 | $2.90 | 19th from lowest | None |
| 9/ 1/60 | 35 | $3.00 | 5th from lowest | None |
| 2/14/61 | 37 | $2.90 | 3rd from lowest | T-24 |
| 9/18/62 | 41 | $2.90 | 7th from lowest | T-18 |
| 1/15/63 | 42 | $2.90 | 3rd from lowest | None |
| 6/19/63 | 43 | $2.90 | 2nd from lowest | None |
| 10/15/63 | 44 | $2.90 | Low bid | T-6 |

While the above table does not reflect the fact that the bid evaluations, due to transportation costs, varied from one steam plant to another, the evaluations used were either those upon which an award was made, or in event West Kentucky was unsuccessful in its bid, upon the evaluation most favorable to the plaintiffs. In only one instance was West Kentucky the low bidder and this was at the Gallatin plant where it enjoyed a transportation advantage. At the Widow's Creek plant West Kentucky was never closer than third from the lowest bidder, and this was only after the Section 22 freight rate reduction had been placed into effect.

"In this regard the plaintiffs sought to substantiate their conspiracy claim by reference to a freight rate reduction granted by the Interstate Commerce Commission in 1960 under Section 22 of the relevant statute. In that year The Louisville and Nashville Railroad

Company and the Tennessee Valley Authority joined in requesting a rate reduction of railway freight rates for hauling coal from the western area of Kentucky to the Widow's Creek steam plant, the request being to reduce this rate from $2.40 per ton to $1.60 or $1.40 per ton, depending upon the volume hauled. This reduction was opposed by coal operators in the Southeastern Tennessee coal field. The reduction was granted by the Interstate Commerce Commission. There is no evidence that this had any relation to any conspiracy involving either the U. M.W. or West Kentucky Coal Company. In any event, since it involves an appeal to a governmental agency, it could not involve a Sherman Act violation. United Mine Workers v. Pennington, 381 U.S. 657, 86 S.Ct. 1585, 14 L.Ed.2d 626.

"The Court concludes that the evidence fails to establish that West Kentucky Coal Company or its subsidiary, Nashville Coal Company, engaged in predatory pricing of coal upon the T.V. A. market. It rather appears that West Kentucky and Nashville based their prices upon legitimate business considerations and were attempting at all times to meet competition, rather than lead the market downward. Having so concluded, it becomes unnecessary to consider further the responsibility of the U.M.W., if any, for West Kentucky and Nashville's coal pricing policies." 265 F.Supp., *supra* at 422. (Footnote omitted.)

There is ample evidence in this record to support these findings; and we certainly cannot hold them to be "clearly erroneous." Fed.R.Civ.P. 52(a).

As indicated at the outset, the judgments of the District Court are affirmed by an equally divided vote in this court.

O'SULLIVAN, Circuit Judge, with whom WEICK, CELEBREZZE and McCREE, Circuit Judges, concur.

The question of law which divides us in this case is whether Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, requires that all elements of a cause of action for antitrust violation must be made out by "clear proof" where a labor union is a defendant, as my brother Edwards holds, or whether the "clear proof" standard of Section 6 is limited to the determination of the authority of "individual officers, members, or agents" to act for a labor union or other organization, as I contend. Such Section 6 of Norris-LaGuardia provides:

"No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

This is plain language which, in my view, clearly exposes the Section's limitation. While not controlling, this is the meaning of the Section as it appeared to the compilers. The black letter title of the Section reads:

"Responsibility of officers and members of associations or their organizations for unlawful acts of individual officers, members, and agents."

The chief assertion of the opinion for affirmance is that in United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585 (1965), the United States Supreme Court announced a rule that Section 6 of the Norris-LaGuardia Act controls the standard of proof as *to all issues* in any antitrust action against a labor union. That it did not do so is, in my view, made clear by the fact that nowhere in the opinions filed in that case (by Justices White, Douglas and Goldberg) is Section 6 of the Norris-LaGuardia Act *even mentioned or discussed*.

The opinion for affirmance places subsidiary reliance on United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130 (1966), and United Bhd. of Car-

penters v. United States, 330 U.S. 395, 67 S.Ct. 775 (1947). Gibbs, however, had nothing to do with an antitrust action and considered only the question of a union's authorization of acts of violence committed by its members. *Carpenters* was a criminal case which considered Section 6 of Norris-LaGuardia only in dealing with the authority of an agent to act for a principal, whether that principal was a labor union *or an employer*. It did not construe Section 6 of Norris-LaGuardia as providing a special rule for labor unions. In this case the District Judge apparently considered that such a special rule existed. He said:

> "Were this case being tried upon the usual preponderance of the evidence rule applicable to civil cases, the Court would conclude that the U.M.W. did so impliedly agree. However, the standard of proof *where a labor union is involved* is 'clear proof,' as required by Section 6 of the Norris-LaGuardia Act, a standard different from the ordinary civil burden of persuasion." Ramsey v. United Mine Workers, 265 F.Supp. 388, 412 (E.D.Tenn.1967). (Emphasis supplied.)

Such also was District Judge Taylor's view in Lewis v. Pennington, 257 F. Supp. 815 (E.D.Tenn.1966), aff'd 400 F.2d 806 (6th Cir. 1968), cert. denied 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444 (1968).

> "It seems apparent that the Court in the Gibbs case by interpretation of the statute, [Section 6 of the Norris-LaGuardia] has placed a heavier burden of proof upon a plaintiff *in this type of case*." 257 F.Supp. at 829. (Emphasis supplied.)

*Carpenters* clearly limits the "clear proof" rule to the matter of proving the authority of an alleged agent. I consider that these District Court opinions, as well as the opinion of my brothers here, fail to properly limit the "clear proof" rule as in *Carpenters*.

Plaintiffs-appellants are, or were, coal mining companies operating in southeastern Tennessee. They appeal from a judgment of the United States District Court for the Eastern District of Tennessee, Southern Division, which dismissed their joint action against the United Mine Workers of America, defendant-appellee. Plaintiffs' action sought damages claimed to have been suffered by them as a consequence of alleged violations by the United Mine Workers of Section 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. This is one of the many lawsuits that have grown out of the substantially successful organization by the UMW of coal mining operations in the southeastern part of Tennessee. Plaintiffs charge that the United Mine Workers had long sought to forbid anyone from carrying on coal mining in the involved territory except those who would pay the wages and meet other conditions imposed by the United Mine Workers. It is their claim that this objective was ultimately accomplished by an illegal combination and conspiracy between a few big coal companies, who formed the Bituminous Coal Operators Association, and the United Mine Workers. Appellants further assert that the plan of the conspiracy was that only those who signed and adhered to the terms of a contract identified as the National Bituminous Coal Wage Agreement of 1950 and its 1958 supplement, the Protective Wage Clause,[1] would be permitted to carry on

I. The National Bituminous Coal Wage Agreement set out the wages to be paid and the other working conditions applicable to the mining of coal in the region involved. The Protective Wage Clause provided:

> "During the period of this Contract, the United Mine Workers of America will not enter into, be a party to, nor

will it permit any agreement or understanding covering any wages, hours or other conditions of work applicable to employees covered by this Contract on any basis other than those specified in this Contract or on any applicable District Contract. The United Mine Workers of America will diligently perform and enforce without discrimina-

coal mining in southeastern Tennessee. It is claimed that the terms of these illegal undertakings were, when needed, implemented by violence visited upon anyone, including the plaintiffs, who essayed to operate independently. Success ultimately marked the United Mine Workers' campaign. We need not here consider the good or evil of the economic and social philosophy which holds that only those industries which, by size and profits, are able to pay wages that are considered adequate by the Unions of their employees, are fit to survive in today's economy.

The history of which this lawsuit is a part will be better learned by reading the District Court opinion in this case, reported as Ramsey v. United Mine Workers, 265 F.Supp. 388 (E.D.Tenn. 1967), and the opinions in related cases: Pennington v. United Mine Workers, 325 F.2d 804 (6th Cir. 1963); United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585 (1965); Lewis v. Pennington, 257 F.Supp. 815 (E.D.Tenn.1966); and Lewis v. Pennington, 400 F.2d 806 (6th Cir. 1968), cert. denied, 393 U.S. 983, 89 S.Ct. 450 (1968). The above-mentioned opinions and related opinions shall be referred to herein as *Pennington* I, II, III and IV, respectively. All of these refer to an action by Pennington and others against the United Mine Workers to recover damages for the claimed Mine Workers' violation of the Sherman Antitrust Act. *Pennington* I was our affirmance of a District Court judgment entered upon a jury verdict which found the Mine Workers guilty of such violation. *Pennington* II was the Supreme Court's reversal of *Pennington* I, remanding the case for a new trial. *Pennington* III was a District Court judgment, entered after trial upon the remand, and *Pennington* IV is this Court's affirmance in part and reversal in part of *Pennington* III.

In the case at bar, the District Judge, in dismissing plaintiffs' action, held that although plaintiffs had made out a case of the Mine Workers' violation of the antitrust laws *by a preponderance of the evidence,* a labor union cannot be convicted of such violation except by the "clear proof" rule of Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106 [2] Testing the sufficiency of plaintiffs' proofs by such rule, he exonerated the Mine Workers of liability. We consider that such ruling was the product of the District Judge's misreading and misapplication of two Supreme Court decisions, viz: United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); and United Bhd. of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947). He concluded that these cases announced a rule that labor unions, as distinguished from all others who might be so accused, cannot be convicted of violation of the Sherman Act unless such violation be established by the so-called "clear proof" rule of Norris-LaGuardia. We would reverse.

It is clear that had the District Judge considered that the ordinary preponderance of the evidence rule applied, he would have found that the United Mine Workers were guilty of Sherman Act violations. The critical question was whether the United Mine Workers and the Bituminous Coal Operators Association had *agreed* to control wages and

tion or favor the conditions of this paragraph and all other terms and conditions of this Contract and will use and exercise its continuing best efforts to obtain full compliance therewith by each and all the parties signatory thereto."

2. "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon *clear proof* of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." (Emphasis supplied.)

working conditions. On this, the District Judge said:

"Having concluded that the Protective Wage Clause does not constitute an *express* commitment upon the part of the U.M.W. to the B.C.O.A. not to bargain with any other coal operator upon any terms other than the national contract, this does not conclude the issue of whether the U.M.W. did *in fact*, though not expressly, so contract with the B.C.O.A. *Were this case being tried upon the usual preponderance of the evidence rule applicable to civil cases, the Court would conclude that the U.M.W. did so impliedly agree.* However, the standard of proof where a labor union is involved is 'clear proof', as required by Section 6 of the Norris-LaGuardia Act, a standard different from the ordinary civil burden of persuasion. United Brotherhood of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973; United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218." 265 F.Supp. at 412. (Emphasis supplied.)[3]

In Pennington v. United Mine Workers, 325 F.2d 804 (6th Cir. 1963)— *Pennington* I—this Court affirmed a judgment, entered upon a jury verdict, finding the United Mine Workers guilty of violating the Sherman Act. The jury awarded plaintiff $90,000 damages, which sum was trebled by the District Court. As will be discussed later herein, the District Judge had advised the jury that plaintiffs' burden was to make out their case by *a preponderance of the evidence.* In our affirmance, we followed the United States Supreme Court's holding in Allen Bradley Co. v. Local 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), that the exemption granted labor unions from the provisions of the Sherman Act by Section 6 of the Clayton Act, 15 U.S.C. § 17,

"does not exist in cases where a labor union combines with a non-labor organization to restrain competition in, or to monopolize the marketing of, goods in interstate commerce." 325 F.2d at 809.

While we cannot say that the facts of *Pennington* I parallel the case at bar in all respects, we are satisfied that the plaintiffs' evidence in that case did not portray with more probative force a violation of the Sherman Act than does the record here. We there held that United Mine Workers were not entitled to a directed verdict and that there was sufficient evidence to permit the jury to find that the United Mine Workers had, to the damage of the plaintiffs—a group of small mine operators—violated the Sherman Act. We affirmed the judgment which was entered on the verdict.

The United States Supreme Court reversed us, United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585 (1965)—*Pennington* II—*not, however, on the ground* that a case of violation of the Sherman Act had not been made out, but remanded for a new trial because of some instructions which the Supreme Court held should not have been given. The criticized instructions had nothing to do with the standard of proof which governed plaintiffs' burden. They affirmed our holding that Pennington, *et al.*, had made out a case to go to the jury. This is made plain by the Court's disposition of the Mine Workers' claim that a verdict should have been directed.

"We first consider UMW's contention that the trial court erred in denying its motion for a directed verdict and for judgment notwithstanding the verdict, since a determination in UMW's favor on this issue would finally resolve the controversy. The question presented by this phase of the case is whether *in the circumstances of this case the union is exempt from liability under the antitrust laws.* We think

---

3. We should make it clear that we need not and do not reach consideration of whether the District Judge's findings were "clearly erroneous." We hold only that

the "clear proof" standard which the Judge applied in making his findings was improper.

the answer is clearly in the negative and that the union's motions were correctly denied." 381 U.S. at 661, 85 S. Ct. at 1589. (Emphasis supplied.)

Therefore, we consider that the Supreme Court has said that the evidence in the case at bar—legally equivalent to *Pennington*—would permit a factfinder —jury or judge—to find the United Mine Workers guilty of violating the Sherman Act. The accused agreement here, as well as in *Pennington* I, was the so-called National Bituminous Coal Wage Agreement, with the 1958 addition to it of the Protective Wage Clauses under which (as charged by plaintiff) "the Union bound itself not to enter into, be a party to, or permit any other kind of labor contract in the industry except the National Agreement which it signed with Bituminous Coal Operators Association." Lewis v. Pennington, 257 F. Supp. at 820.

In *Pennington* I, the charge of antitrust violation against the Mine Workers was made in the cross-complaint of Pennington, *et al.* In his general submission of the case to the jury, the District Judge charged that,

> "before it [the cross-complainant] can recover on its cross-claim, it is required to make out its case substantially as alleged in the cross-claim by a *preponderance of the evidence* * * *. In order to recover * * * upon the conspiracy, Phillips Brothers [Pennington] must show *by a preponderance of the evidence* that the conspiracy * * * existed during the period of the case * * *. The burden of proof and *the preponderance of*

*the evidence* ordinarily have reference to direct evidence and indirect or circumstantial evidence. * * * Indirect evidence is that knowledge that is inferred from known facts.[4]" (Emphasis supplied.)

It should be noted that in the Mine Workers appeal from the verdict in *Pennington* I, none of its five Questions Involved attacked the style of the above instruction. They did question the instructions which the Supreme Court found erroneous, but those did not relate to standard of proof. In their appeal to us, in urging that a verdict should have been directed for insufficient proof, the Mine Workers contended that Section 6 of Norris-LaGuardia should have been applied in testing whether there was any sufficient evidence to allow the jury to find the Mine Workers guilty of Sherman Act violations. In our opinion in *Pennington* I, 325 F.2d 804, we rejected such contention by finding that the District Judge correctly submitted the case to the jury and by sustaining the District Judge's denial of the Mine Workers' motion for new trial which, *inter alia,* again asserted that Section 6 of Norris-LaGuardia was the controlling rule.

In their brief to this Court in *Pennington* I, the Mine Workers asserted:

> "As already observed, Phillips' [Pennington] burden was not only to prove the unlawful conspiracy but, as the trial court charged, to prove it by 'clear proof'.[5] Not only is 'clear proof' lacking, there is absolutely no proof whatsoever."

---

4. It should be mentioned that the District Judge did instruct the jury that "clear proof" was required in the jury's consideration of whether particular acts of union members had been authorized by the United Mine Workers. He instructed the jury as follows:

> "Similarly, unions act through their officers, agents, employees and members and no union participating or interested in a labor dispute may be held responsible or liable in any court of the United States for the unlawful acts of

individual officer, members or agents, except upon clear proof of actual participation in, or actual authorization of, such act, or of ratification of such acts after actual knowledge thereof."

This was a correct charge upon the limited application of Norris-LaGuardia, Section 6.

5. As set out earlier, the District Judge, in his instruction as to "clear proof," correctly limited application of such rule to the matter of authorization of acts by agents, etc.

In their petition to the Supreme Court for writ of certiorari to review *Pennington* I, the United Mine Workers included in its Questions Presented the following:

"Where a labor union is charged with having conspired with employer groups in violation of the Sherman Anti-trust Act when it executed an industry-wide, multi-employer collective bargaining agreement in conformity with injunctive orders of a federal district court, union denials of the conspiracy are uncontradicted, and there is no direct evidence proving the conspiracy, may a court or jury infer the existence of a conspiracy from union activities either sanctioned under law or within the jurisdiction of the National Labor Relations Board, *in light of the antitrust immunity of labor unions and the clear proof requirement of Section 6 of the Norris-LaGuardia Act?*" (Emphasis supplied.)

We read the Supreme Court's holding in *Pennington* II, as rejecting the assertion presented by that question.

District Judge Taylor's opinion upon retrial—*Pennington* III—was the first announcement by any court that labor unions are insulated from liability under the Sherman Act unless their violations are made out by the "clear proof" standard of Norris-LaGuardia. He stated:

"The standard of proof necessary to show predatory intent is governed by the recent decision of the Supreme Court in United Mine Workers of America v. Gibbs (C.A.6, March 28, 1966), 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218." 257 F.Supp. at 829. (Emphasis supplied.)

and further that:

"It seems apparent that the Court in the *Gibbs* case by interpretation of the statute, has placed a heavier burden of proof upon a plaintiff *in this type of case.*" 257 F.Supp. at 829. (Emphasis supplied.)

The quotations from Justices Brennan and Harlan set out by Judge Taylor im-

mediately preceding the above are both from the *Gibbs* case. Judge Taylor did not cite the Supreme Court opinion in *Pennington* II as support for the new "clear proof" rule that he announced. His reliance was on *Gibbs*, but the *Gibbs* case *had nothing whatever to do with the Sherman Act or the Clayton Act.*

Gibbs had sued the United Mine Workers and recovered damages for secondary boycott and a state common law tort. The relevant question was whether UMW could be held liable for violence committed by some of its members in stopping Gibbs' effort to begin a mining operation. The Supreme Court merely held that Section 6 of the Norris-LaGuardia Act required Gibbs to make "clear proof" that the UMW had authorized, approved or ratified the violence. This is the case's holding:

"What is required is proof, either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or intentionally drew upon the previous violence for their force." 383 U.S. at 739, 86 S.Ct. at 1146.

It found that Gibbs' evidence did not, by "clear proof," establish the union's authorization of or participation in the violence committed. In the case at bar, except as to responsibility for violence, there was no issue as to whether what was done by the Mine Workers' officers or agents had the approval of the union. No such question was raised. The National Bituminous Coal Wage Agreement and the 1958 Protective Wage Clause made between the Bituminous Coal Operators Association and the United Mine Workers were admittedly executed by the proper authorities of the union and Norris-LaGuardia was in no way involved in these critical matters.

The application of the Norris-LaGuardia "clear proof" rule as the standard of proof in Sherman Act suits against labor unions had its genesis in Lewis v. Pennington, 257 F.Supp. 815

(*Pennington* III). A reading of the opinion of Judge Taylor in that case will disclose that he did not rely upon the Supreme Court's opinion in *Pennington* II for the rule he announced—*Gibbs* was his authority. The first intimation that the Supreme Court's opinion in *Pennington* II contained such a rule came in Judge Wilson's opinion in the case at bar and in this Court's opinion in *Pennington* IV, 400 F.2d 806 (1968), affirming Judge Taylor's *Pennington* III. Our opinion in that case emphasizes the words "clearly shown" in quoting from one of the sentences in Mr. Justice White's *Pennington* II opinion, where he said:

"'But we think a union forfeits its exemption from the antitrust laws when it is *clearly shown* that it has agreed with one set of employers to impose a certain wage scale on other bargaining units.' 381 U.S. at 665, 85 S.Ct. 1585. (Footnote omitted; emphasis added.)" 400 F.2d at 813.

This is followed by this Court's language:

"We thus understand *Pennington* to teach that:

"1) a conspiracy between employers and labor formed with the intention of driving competitors out of business is a violation of the Sherman Act;

"2) 'predatory intent' (as used by Mr. Justice White (381 U.S. at 668, 85 S. Ct. 1585) and by Judge Taylor) is merely shorthand, employed to describe this anti-competitive conspiracy; and

"3) such an anti-competitive conspiracy must be established by 'clear proof'. See also United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130 (1966). "While the jury by its verdict in the first trial of this case had found a conspiracy between the UMW and large mine operators to put smaller mine operators out of business by a preponderance of the evidence, Judge Taylor found such a conspiracy not to have been shown by 'clear proof' at the second trial. Judge Taylor prop-

erly concluded that a degree of proof less than the 'beyond a reasonable doubt' requirement in criminal cases but greater than the 'preponderance of the evidence' standard of civil actions is necessary. 257 F.Supp. at 829. The District Court's determination that judged by this standard evidence of sufficient probity had not been offered is supported by a review of the record and is not clearly erroneous. Rule 52 F.R.Civ.P." 400 F. 2d at 814.

We are not persuaded that the context of Mr. Justice White's use of the words "clearly shown" in the sentence quoted justifies their being read as announcing a new rule giving labor unions special treatment in defending suits under the Sherman Act. The concurring opinion of Mr. Justice Douglas, joined by Mr. Justice Black and Mr. Justice Clark, does not even discuss the subject. Neither does Mr. Justice Goldberg, who was joined by Mr. Justice Harlan and Mr. Justice Stewart in dissenting form *Pennington* II.

That the words "clearly shown" were not employed by Justice White to announce the rule claimed by Judge Taylor in *Pennington* II and by Judge Wilson in this case is made clear by the fact that neither in Justice White's opinion nor in any of the others in *Pennington* II is Section 6 of Norris-LaGuardia even mentioned. It is that statute which is the sole basis for the claim that "clear proof" is the standard applicable to the burden of proving all elements of a labor union's violation of the Sherman Act.

Congress has been attentive to the needs of organized labor. Lest, in serving their own ends, labor unions be swept into the prohibitions of the Sherman Act, the Clayton Act came into being in 1914 to protect the unilateral activities of a labor union from antitrust condemnation. The Supreme Court's opinion in Allen Bradley Co. v. Local 3, IBEW, 325 U.S. 797, 65 S.Ct. 1533 (1945), however, forbade labor unions from joining hands with management in conduct proscribed by the Sher-

man Act. The Norris-LaGuardia Act was enacted in 1932 as a restraint upon the then-increasing intrusions of federal court injunctions into genuine labor disputes; its Section 6 (29 U.S.C. § 106) provided that the participants in labor disputes, whether employer or a union of employees, could not be cast in damages, or be made otherwise liable for unlawful acts of their agents, except by *clear proof* of the authority of such agents to act for their principals. The "clear proof" rule was created by Congressional Act, with clear definition of its limited application. We are not at liberty to do violence to its plain language by reading into it new and special antitrust insulation of labor unions not contained in the exemption granted them by the Clayton Act. Certainly the *Gibbs* case did not do so, and we are not persuaded that two words included in a general observation by one of the Justices in *Pennington II* did so.

Judge Wilson specifically found that, *by preponderance of the evidence,* plaintiffs had established that the joint action of the BCOA and the Mine Workers in entering into and using the National Bituminous Coal Wage agreement with its Protective Wage Clause, and the implementing of them, established an agreement violating the Sherman Act. While he did not express himself as to how he would have found as to all of the other issues of fact had he adhered to the traditional preponderance of evidence rule, he made it plain that he followed the "clear proof" rule in passing on responsibility for violent conduct by agents or members of the union. The *Gibbs* rule was correctly applied to that issue.

The other case relied upon to support the "clear proof" rule was United Bhd. of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947). In that criminal case, unincorporated trade unions and their officials were alleged to have conspired with some manufacturers and dealers and their incorporated trade associations to monopolize and restrain trade in the manufacture of and dealing in, millwork and patterned lumber. The only holding relevant to the Norris-LaGuardia Act was that, wherein the government sought to hold the involved trade associations or parent unions responsible for acts done by their individual officers, members, or local unions, the authority to so act for their principals had to be made out by clear proof. This is the totality of the case's relevant holding:

> "We hold that its [Section 6 of the Norris-LaGuardia Act] purpose and effect was to relieve organizations, *whether of labor or capital,* and members of those organizations from liability for damages or imputations of guilt for lawless acts done in labor disputes *by some individual officers or members of the organization, without clear proof that the organization or member, charged with responsibility for the offense, actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration."* 330 U.S. at 403, 67 S.Ct. at 780. (Emphasis supplied.)

This, indeed, is not a holding that the "clear proof" rule has, in antitrust cases against labor unions, replaced the substantive rule of preponderance of the evidence. The Supreme Court in *Carpenters* was careful to express the limit of the rule:

> "There is no implication in what we have said that an association or organization in circumstances covered by § 6 [Norris-LaGuardia] must give explicit authority to its officers or agents *to violate in a labor controversy the Sherman Act* or any other law or to give antecedent approval to any act that its officers may do." 330 U.S. at 409–410, 67 S.Ct. at 783. (Emphasis supplied.)

Had adherence to or establishment of a rule that plaintiffs had to establish their entire case by the "clear proof" of Norris-LaGuardia been decisive of our *Pennington IV, stare decisis* would forbid this early a departure from it. But the adoption or approval of such a rule was dictum in Judge Taylor's opinion and in

our affirmance.[6] He concluded his finding on Sherman Act violation as follows:

"The Court is of the opinion and finds that plaintiffs have failed to prove, *either by a preponderance of the evidence* or by the standards of evidence established by the Supreme Court in UMW v. Gibbs, supra, that the defendant engaged in a combination or conspiracy so as to unreasonably restrain trade or to monopolize commerce among the several states as alleged in the complaint. In this connection, *the Court observes that the extensive evidence introduced by plaintiffs of violence in the coal fields is consistent with the Union's determination to unionize the units of the entire area*, and, in the light of the Court's conclusion just noted, is insufficient to show a Sherman Act antitrust violation." 257 F.Supp. at 864. (Emphasis supplied.)

Thus, it is clear that Judge Taylor's exoneration of the Mine Workers was not dependent upon application of the clear proof rule of Norris-LaGuardia. He found that plaintiffs had not made out a case under the traditional rule of *preponderance of the evidence.*

Plaintiffs' evidence in this case generously portrayed how propitious was the setting for the victory achieved by the BCOA and the Mine Workers in implementing their agreement. The District Court opinion at length sets out the relevant facts. Among other things, it was shown that the Mine Workers loaned to one Cyrus Eaton some $25,000,000 to enable him to acquire *for them* control of the capital shares of West Kentucky Coal Company—the biggest of the members of BCOA—and its subsidiary, Nashville Coal Company. By having Eaton so invest the union's money, the Mine Workers acquired the voting rights of West Kentucky Coal Company and Eaton became Chairman of the Board, and:

"Immediately after Mr. Eaton assumed control, West Kentucky signed the National Bituminous Coal Wage Agreement, the first time in its history that it had signed a contract with the U.M.W." 265 F.Supp. at 414.

Judge Wilson further observed:

"Furthermore, the reasons for which loans and investments were made in West Kentucky and its subsidiary, Nashville Coal Company, must likewise largely be inferred, *as the reasons given by the U.M.W. for doing so will not bear scrutiny.*" 265 F.Supp. at 414. (Emphasis supplied.)

It would indeed be over kind to accord credence to the asserted claim that the making of the National Bituminous Coal Wage Agreement and the Protective Wage Clause between the United Mine Workers and their controlled West Kentucky Coal Company was an arm's length" transaction, free of conspiratorial and predatory purpose. The Mine Workers lost eight of the twenty-five million dollars which it invested in the management side of the accused transactions. For its victory, it was apparently willing to pay this bill as well as the many hundreds of thousands of dollars which it paid for the depredations and violence—the reign of terror—which it employed in driving out of coal mining those who could not live with the terms of the National Bituminous Wage Agreement. See Flame Coal Co. v. United Mine Workers, 303 F.2d 39 (6th Cir. 1962); United Mine Workers of

---

6. We should mention that although Judge Taylor found no Sherman Act violation in *Pennington III*, he gave judgment to two plaintiffs for $311,787 as compensatory and punitive damages for the Mine Workers' depredations against these small mine operators in its drive to put out of business any operator attempting to carry on without signing the Uniform National Bituminous Coal Wage Agreement. He held the conduct violative of the law of Tennessee. This Court's latest *Pennington* decision, *Pennington IV*, remanded the case to the District Court for reconsideration and more specific findings concerning the award of damages for the United Mine Workers' violation of Tennessee law.

America v. Osborne Milling Co., 279 F. 2d 716 (6th Cir. 1960), cert. denied, 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960); Gilchrist v. United Mine Workers, 290 F.2d 36 (6th Cir. 1961). District Judge Wilson described the Mine Workers' conduct in this language:

> "The evidence in this case reflects once again that the 'history of the bituminous coal industry is written in blood as well as ink.' Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263." 265 F.Supp. at 428.

and further,

> "A great deal of violence, bloodshed and destruction of property has accompanied the strike [discussed in the opinion]. Much suffering, deprivation and want has occurred. The Southeastern Tennessee coal field remains a blighted area." 265 F.Supp. at 428.

He sums up the situation as follows:

> "In the period since 1960 the coal operators in the Southeastern Tennessee coal field have been unable to compete and survive in the T.V.A. coal market under the National Bituminous Coal Wage Agreement. While in many instances this appears to have been due to antiquated mining methods and equipment or other causes, the fact nevertheless remains that since 1960 there has not been a single instance of a successful coal mining operation in the Southeastern Tennessee coal field under the National Bituminous Coal Wage Agreement and this in spite of the fact that the *only feasible alternative facing most coal operators in the area was to operate under the national contract or go out of business.*" 265 F.Supp. at 430. (Emphasis supplied.)

There is nothing in the record of this case to suggest that the conception and prosecution of the grand plan we deal with was the work of irresponsible underlings. The total enterprise was directed from high echelons of authority. Top people of the United Mine Workers and the Bituminous Coal Operators Association did not need the protection of Norris-LaGuardia when they negotiated and signed the National Bituminous Coal Wage Agreement and its Protective Wage Clause, nor when the Mine Workers invested $25,000,000 to aid the big coal companies to fulfill the promise of the plan.

Peace has indeed come to Southeastern Tennessee's part of Appalachia, but it is the peace of obedience to the overlords of big business and big labor. Of this situation, Mr. Justice Douglas, in his *Pennington* concurrence, appropriately observes:

> "Congress can design an oligopoly for our society, if it chooses. But business alone cannot do so as long as the antitrust laws are enforced. Nor should business and labor working hand-in-hand be allowed to make that basic change in the design of our so-called free enterprise system." 381 U.S. at 674, 85 S.Ct. at 1595-96.

We would vacate the judgment of the District Court and remand the cause for further proceedings consistent herewith.