SMITTY BAKER COAL COMPANY,
INC., Appellant,

v.

UNITED MINE WORKERS OF
AMERICA, Appellee.

SMITTY BAKER COAL COMPANY,
INC., Appellee,

v.

UNITED MINE WORKERS OF
AMERICA, Appellant.

Nos. 78–1814, 78–1815.

United States Court of Appeals,
Fourth Circuit.

Argued June 4, 1979.

Decided April 11, 1980.

Claude K. Robertson, J. Edward Ingram, Knoxville, Tenn. (Fowler, Rowntree, Fowler & Robertson, Knoxville, Tenn., Joseph E. Wolfe, Earls, Wolf & Farmer, Norton, Va., on brief), for appellant in No. 78–1814 and for appellee in No. 78–1815.

Stuart B. Campbell, Jr., Wytheville, Va., E. H. Rayson, Knoxville, Tenn. (Harrison Combs, Washington, D. C., on brief), for appellee in No. 78–1814 and for appellant in No. 78–1815.

Before HAYNSWORTH, Chief Judge, BRYAN, Senior Circuit Judge, and RUSSELL, Circuit Judge.

DONALD RUSSELL, Circuit Judge:

This is an action by the plaintiff Smitty Baker Coal Company, Inc. (Smitty Baker) charging a conspiracy by the defendant United Mine Workers (UMW) violative of the antitrust laws,[1] to which it joined an action under the National Labor Management Relations Act. The action under the National Labor Management Relations Act was abandoned, and the cause proceeded solely under the antitrust claim. At trial the plaintiff recovered a verdict against the defendant for $1,250,000.[2] After trial defendant moved for judgment notwithstanding the verdict or in the alternative for a new trial. Following submission of briefs and full oral argument, the district court, in a carefully reasoned memorandum opinion,[3] denied defendant's motion for a new trial and granted the motion for judgment notwithstanding the verdict. In its opinion granting the motion it concluded that, while there was sufficient evidence from which the jury might infer a conspiracy under the Sherman Act, the plaintiff had failed to produce any facts to support its contention that it had suffered damages as a result of the conspiracy. The plaintiff appeals from the judgment notwithstanding the verdict in favor of the defendant and the dismissal of its action; the defendant cross-appeals from the finding of conspiracy.

So far as pertinent to our decision, the significant facts in this case are as follows: In 1969 Ralph Baker, who had worked about mines most of his adult life, approached a representative of Peabody Coal Company, the owner of considerable coal lands in Lee County, Virginia, with a request for a lease of certain of such lands. Peabody granted the request. The lease dated August 1, 1969, however, was not taken in Ralph Baker's name but in the name of a corporation, which Ralph Baker had had chartered and which is the plaintiff in this action. The sole stockholder of this corporation was Ralph Baker's nineteen-year-old son, Smitty Baker, then a student at Lincoln Memorial University. The capital of the corporation consisted of 100 shares, issued for a consideration of one dollar per share, thus giving the corporation a capital of exactly one hundred dollars. No additional stock was ever issued and no other contributions to capital made. The actual payment to the corporation for the

---

1. Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

2. After verdict the plaintiff moved for trebling of damages and for attorneys fees. Because of later proceedings these motions were not acted upon.

3. *Smitty Baker Coal Co. v. United Mine Wkrs.*, (W.D.Va.1978) 457 F.Supp. 1123.

stock issued was made by Ralph Baker from his funds. Throughout the life of the corporation the complete control and management of the corporation were always exercised by Ralph Baker; so far as the record indicates, Smitty Baker never took any significant part in such management.

Before beginning operations at its leased site, the plaintiff entered into a collective bargaining agreement with the defendant. UMW. Ralph Baker testified he did this because he was told when given the lease by Peabody that he "would have to sign an United Mine Workers Agreement." This demand, it is alleged, was made because of the Coal Lands Clause in the 1968 agreement, of which Peabody was a signatory.[4] The labor agreement accepted by the plaintiff under these circumstances was the standard 1968 contract negotiated between the UMW and a multi-employer bargaining group of mining employers. The negotiation of this contract followed a practice long established in the coal industry, whereby a group of the larger operators would join together as a multi-employer bargaining unit known as the Bituminous Coal Operators Association (BCOA) to negotiate on their behalf a labor contract with the negotiating council of the Union. The contract so negotiated bound all the operator-members of the unit. Non-member operators, however, became bound by the contract only if they thereafter agreed to do so.[5]

The plaintiff was not in a position to begin mining operations until about October 1969. From the outset these operations were successful. Its efforts at selling its coal resulted in a contract with Tennessee Valley Authority (TVA) for the supply to the latter of 2,000 tons of coal a week. The plaintiff was actually offered later a contract for 2,000 more tons by TVA, but it refused the offer. Experiencing no difficulty in its mining operations or in the marketing of its productions, it had a pretax profit of $20,985 and an after-tax profit of $9,968.12 for the year ending December 31, 1970, on its hundred dollar capital investment. Despite the fact that its operations ceased on October 1 of the year following due to the strike to which we later refer, 1971 was similarly a profitable year, showing after-tax profits of $36,104.38 and a net worth of $57,657.15 at the end of that year.

The relations between the plaintiff and the UMW as the representative of the former's employees were apparently cordial and cooperative during the period of the 1968 labor contract. However, the 1968 collective bargaining contract was, by its terms, terminable by either party on September 30, 1971, provided sixty days' notice of such termination was given the other party. The required sixty-day notice of termination was concededly given by the UMW to the multi-employer group with whom the contract had been negotiated initially, but Baker testified his company was not personally given such notice. In any event, though, Baker admitted he knew that the contract was being terminated on October 1st, and he attempted to make plans to counter any effect of the strike on the corporation's business. Accordingly, on September 30, the date fixed for the contract's termination, Baker called together the local officers of the UMW Union and proposed to them that, if the local would not strike and its members would continue working after September 30, he would stipulate on behalf of the plaintiff to pay,

---

4. This Coal Lands Clause was in this language: "As part of the consideration for this agreement, the operators signatory hereto agree that this agreement covers the operation of all the coal lands, coal producing and coal preparation facilities owned or held under lease by them, or any of them, or by any subsidiary or affiliate at the date of this agreement, or acquired during its terms which may hereafter [during the term of this agreement] be put into production or use.

The operators agree that they will not lease, license or contract out any coal lands, coal producing or coal preparation facilities for the purpose of avoiding the application of this agreement or any section, paragraph or clause thereof."

5. See *Ramsey v. Mine Workers*, (1971) 401 U.S. 302, at 305, n. 2, 91 S.Ct. 658, 661, n. 2, 28 L.Ed.2d 64.

retroactive to October 1, the wages as fixed in the contract which might later be negotiated between the multi-employer group and the Union. This proposal was refused; and, when the local UMW joined the general strike by UMW members, following the traditional UMW practice of "no contract—no work," the plaintiff's mines were forced to close. No particular discussions between Baker and the UMW took place thereafter until November 16, 1971.

On November 14, 1971, the UMW and the multi-employer bargaining group reached an agreement on a new collective bargaining agreement. Considerable publicity, particularly in the coal field, was given this development. Baker testified, though, that he did not hear of the agreement until two days later. In the meantime, on November 15, 1971, Baker testified he was called to the mines to "sign a contract." At the mines he met a representative of the Southern Labor Union (SLU), a rival labor organization of the UMW. The SLU representative was accompanied by some employees of the plaintiff. He produced 10 signed cards. Three of these cards were signed by supervisors in the plaintiff's mines, three by employees of the plaintiff, and four by individuals not previously employed by the plaintiff. Within the hour Baker signed the agreement submitted to him by SLU as the collective bargaining representative of the plaintiff's employees.

The next day, November 16, a representative of the UMW visited Baker and requested him to sign a stipulation agreeing to the terms of the new contract which the UMW had negotiated with the multi-employer group. Baker refused, offering as the only reason for not signing that he had just signed a contract with the SLU and he "didn't think [he] could sign two contracts." The UMW representative reacted to this statement by declaring that in his opinion Baker in negotiating and executing a contract with the SLU had committed an unfair labor practice.[6] The meeting terminated with the UMW representative stating that he intended to take the matter to the National Labor Relations Board, which he did. An investigation of the charges of the UMW by the Board began in December, but before the investigation was concluded, the SLU elected not to contest the charges and abandoned its claim to represent plaintiff's employees. The UMW then withdrew its charges, assuming that it was agreed that it was the legal representative of a majority of plaintiff's employees in the bargaining unit.

While the NLRB charges were pending there were no communications between the defendant UMW and the plaintiff. On December 13, however, Baker's wife was told in a telephone call from the NLRB that the charges filed by the UMW against the plaintiff had been dropped. Baker told a representative of Peabody the next day that the charges had been dismissed, and expressed a desire to talk about a renewal of the corporation's lease. The representative of Peabody replied that he and a representative of the UMW would call on him (Baker) the next day. On December 15 the representatives of Peabody and the UMW visited Baker. The UMW representative presented Baker with the new contract and asked him to sign it. Baker took no excep-

6. The employees of the plaintiff who went on strike at the time the Union claimed the contract had terminated did not lose their status as employees during the strike. The circumstances under which strikers, on termination of the contract, may lose their status as employees are detailed in *NLRB v. Fleetwood Trailer Co.*, (1967) 389 U.S. 375, 378–79, 88 S.Ct. 543, 546, 19 L.Ed.2d 614. Those circumstances did not prevail here. Furthermore, the Union remained the presumed bargaining agent for these employees even though its contract had terminated, since the plaintiff made no showing that the Union had lost its status as the repre- sentative of a majority of the employees in the unit. *Terrell Machine Company v. N.L.R.B.*, (4th Cir. 1970) 427 F.2d 1088, 1090, *cert. denied*, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91. Moreover, the plaintiff with its operations completely closed by a strike called by the Union, had every indication that the Union continued to represent a majority of its employees in the bargaining unit and to bargain with and enter into a contract with a rival union in that context could well have been regarded as an unfair labor practice. *N.L.R.B. v. Trosch*, (4th Cir. 1963) 321 F.2d 692, 695, *cert. denied*, 375 U.S. 993, 84 S.Ct. 632, 11 L.Ed.2d 478 (1964).

tion to the contract or any of its provisions and expressed a willingness to sign the contract when he was formally advised in writing by the NLRB that the charges had been dropped. Until then he said he would not sign. Thus rebuffed, the representative of the UMW left.

The next day Baker had a meeting with the officers of the local UMW at his request. At that meeting he told them, as an inducement for his employees returning to work, that he was willing to stipulate to pay the wages and benefits provided in the 1971 contract and to sign the contract itself, as soon as he received a letter from NLRB that the charges filed by the UMW had been dismissed, and that if he did not receive such letter within thirty days the employees could resume their strike. When this conversation was reported to the negotiator for the UMW he promptly communicated with Baker, requesting a more specific statement of Baker's proposal. This resulted in the parties bringing their attorneys into the negotiations, and proposals prepared by the attorneys for the parties were exchanged between the parties over a period of time.

■ Sometime in January 1972, Baker, through his counsel, for the first time raised the point that he could not pay the wage scale and the employee benefits provided in the new 1971 contract. In answer to this contention the UMW requested the opportunity to examine the plaintiff's books.[7] When this request was refused the UMW proposed that Baker resume operations under the new 1971 contract with a rider thereto that if it developed that the plaintiff could not successfully operate under that contract, there would be a renegotiation of the terms of the contract. This proposal was rejected by Baker through his counsel, who proposed that work be re-

sumed under the 1968 contract. The UMW, while finding this proposal unacceptable, suggested another meeting. The suggestion was unanswered by Baker. At the end of January the Union employees of the plaintiff submitted to Baker a proposal to perform maintenance work as a prelude for further negotiations. This was agreed to by Baker. When, however, work under this agreement began in February, 1972, it was discovered that a rock fall had occurred in the mines, requiring some repair work. Baker then said that to make the necessary repairs would require more funds than the plaintiff had, and he determined to abandon the development and liquidate the assets of the plaintiff. Some $42,000 was realized from the liquidation. Baker then began operations in March on another mining tract, with a labor contract, executed before any employees had been hired, with the SLU. This action followed.

In its antitrust complaint the plaintiff stated initially the history of labor relations in the coal industry, and particularly the part the UMW played in that history, during the period of the 50's and early 60's. It alleged an agreement of the UMW with the multi-employer group on a Protective Wage Clause (PWC) for inclusion in the collective bargaining agreement reached by them, the purpose of which, according to the plaintiff's allegations, was to boycott "non-union and sweetheart produced coal" and that, "in furtherance of that conspiracy," the UMW, by this Clause, obligated itself not to "enter into, be a party to, or permit any other or different contract than the National Contract, as amended, and \* \* \* [to] fully enforce the National Contract in all other bargaining units." It adds that the PWC, though omitted from the 1964 and 1968 agreements, has "continued [to be enforced by the UMW] to the present time." However, in describing particularly the plain-

---

7. This was a perfectly legitimate request under the circumstances. In fact, where an employer asserts financial inability to meet the wage demands in a bargaining agreement, he is obligated to make available to the Union his financial records so that the Union can determine whether the claim is sound, and a failure to do so may lay the employer open to an unfair

labor charge. *See Labor Board v. Truitt Mfg. Co.*, (1956) 351 U.S. 149, 152–53, 76 S.Ct. 753, 755–56, 100 L.Ed. 1027; *N.L.R.B. v. Southland Cork Company*, (4th Cir. 1965) 342 F.2d 702, 706; *Teleprompter Corp. v. N.L.R.B.*, (1st Cir. 1977) 570 F.2d 4, 9; *N.Y. Printing Pressmen & Offset, Etc. v. N.L.R.B.*, (2d Cir. 1976) 538 F.2d 496, 499–501.

tiff's own operations commencing in 1969, the plaintiff directs its complaint at the strike on October 1, 1971, against it by the UMW, which the plaintiff claims was begun in violation of the terms of its agreement with the UMW and was thus in violation of the National Labor Relations Act. It avers that this so-called illegal strike was continued until the plaintiff "was insolvent and * * * forced to abandon its mines." It charged that the Union refused during the strike to negotiate "a contract [with it] with which plaintiff could live" and thereby end the strike. This refusal, the plaintiff charges, was "in furtherance of the terms of the conspiracy with the large coal operators of the industry," as hereinabove enumerated, aimed at forcing the National Contract upon all companies in the industries regardless of their ability to operate under a contract, "all of which [was] in violation of §§ 1 and 2 of the Sherman Antitrust Act" and which was "not for the purpose of improving the wages, hours and working conditions of [UMW's] members."

The action in due course proceeded to trial. A considerable part of the testimony at trial consisted of testimony and records from certain *Pennington*-type cases earlier tried. After the conclusion of the testimony, the defendant moved for a directed verdict. The motion was refused and the district court submitted the cause to the jury under instructions which treated the action as a *Pennington-Ramsey* type case,[8] later discussed. Thus, tracking largely *Ramsey*, the district court said in its jury instructions:

> "A labor union violates the Sherman Antitrust Act when it agrees with one bargaining unit of employers to impose upon other employers specified wage terms which are harmful or ruinous to the business of such other employers. Any agreement by a union with a business group to secure uniform labor standards throughout the industry is not exempt from the Antitrust Laws, and

where a union agrees with one set of employers that the Union will insist on imposing or maintaining on other bargaining units specified wage standards harmful or ruinous of the business of those employers, it may be liable under the Antitrust Laws for the damages caused by its agreed upon conduct."

The jury returned a verdict for the plaintiff, but, upon motion of the defendant, the district court set aside the jury verdict and granted judgment notwithstanding the verdict (n. o. v.) in favor of the defendant.

In its order granting the motion for judgment n. o. v. the district court first held "that the evidence was sufficient for the jury to infer that a conspiracy did exist between the UMW and certain of the major coal producers." It reached this conclusion on the basis of what it found in this case to be "an almost identical factual situation" to that found in a decision of the Sixth Circuit, *Tennessee Consolidated Coal Co. v. United Mine Wkrs. of Am.*, (6th Cir. 1969) 416 F.2d 1192, *cert. denied*, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970). The two facts in the record which it cited as supporting this conclusion were "the Protective Wage Clause of 1958," which it found ambiguous and subject to jury construction, and the "Eighty Cent Clause." The district court, however, found "that there was insufficient evidence for the jury to find that the plaintiff's injuries were suffered as a direct and proximate cause of the conspiracy." It was on this latter basis that the district court granted judgment n. o. v. in favor of the UMW.

We address first the conspiracy issue as raised by the UMW. In its conspiracy allegations and largely in its proof at trial the plaintiff sought to identify its claim both factually and legally with the *Pennington* line of cases. Similarly the district court premised its conspiracy ruling on a decision, which is but an "off-shoot" of *Pennington*.[9] Accordingly, any discussion of the conspir-

---

**8.** *Mine Workers v. Pennington*, (1965) 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626; *Ramsey v. Mine Workers*, (1971) 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64.

**9.** *Tennessee Consolidated Coal Co. v. United Mine Wkrs. of Am.*, 416 F.2d 1192.

acy ruling must begin with an analysis of the *Pennington* decision itself. Before doing so, however, it seems appropriate to review the statutory and decisional background of *Pennington.*

*Pennington* represented another step in what was the reconciliation of two conflicting national policies, one expressed in the antitrust laws and designed to prevent monopoly and promote competition, and the other a labor policy favoring collective bargaining over labor standards between employers and employees with the inevitable goal of eliminating competition among workers over wages and labor costs. With such disparate aims, the two policies would inescapably clash unless carefully harmonized.[10] And, as Dean St. Antoine has written, "To harmonize them, the type of competition which the law is intended to foster (under the antitrust laws) must be carefully distinguished from the type of competition which union-employer bargaining can properly displace."[11] Both Congress and the Supreme Court have sought to achieve a reasonable accommodation of the conflicting aims of the two policies and to mark out the distinction identified by Dean St. Antoine. The Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52, and the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105, and 113, along with the Wagner Act, 29 U.S.C. § 151, *et seq.,* with its encouragement of collective bargaining between labor and management, represent Congress' contribution to this reconciliation. In these statutes Congress declared explicitly that the "labor of a human being is not a commodity or article of commerce" and that "the antitrust laws [may not] be construed to forbid the existence * * * of labor * * * organizations, * * *, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; * * *."[12]

The Supreme Court, in turn, recognized that, in giving effect to these efforts by Congress to reconcile the two national policies, it had to adapt the antitrust remedies so as to give effect to this distinction of competition over wages and working conditions from competition in the sale and marketing of goods and services and to "the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions."[13] With these ends in mind, it has sought to establish guidelines for reconciling the two declared congressional policies and, in so doing, has gone on to create what it has described as a nonstatutory exemption[14] in favor of labor, which protects wage competition from the prohibition of the antitrust

---

**10.** In *Allen Bradley Co. v. Union,* (1945) 325 U.S. 797, 806, 65 S.Ct. 1533, 1538, 89 L.Ed. 1939, Mr. Justice Black stated the problem thus:

> "The result of all this is that we have two declared congressional policies which it is our responsibility to try to reconcile. The one seeks to preserve a competitive business economy; the other to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining."

*See also* Comment, *Labor-Antitrust: Collective Bargaining and the Competitive Economy,* 20 *Stan.L.Rev.* 684, 704 (1968):

> "But collective-bargaining agreements over labor standards inevitably have anticompetitive consequences; to infer from these agreements the necessary elements of a conspiracy to restrain trade under the antitrust laws makes no accommodation for the fact that the national labor policy is based upon the conclusion of these agreements."

**11.** St. Antoine, *Collective Bargaining and the Antitrust Laws,* 115 *Pitt.Legal J.* 25 (1967).

**12.** 15 U.S.C. § 17.

**13.** This point was made recently by Mr. Justice Powell in *Connell Co. v. Plumbers & Steamfitters,* (1975) 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418, *reh. denied,* 423 U.S. 884, 96 S.Ct. 156, 46 L.Ed.2d 114, where, speaking for the court, he said that the various Congressional declarations of labor policy "require[d] tolerance for the lessening of business competition based on differences in wages and working conditions."

**14.** The commentator in *The Supreme Court, 1974 Term,* 89 *Harv.L.Rev.* 47, 236, n. 13, finds "[t]he distinction between 'statutory' and 'nonstatutory' exemptions, however, is somewhat misleading. All the major cases involving labor's antitrust exemption have purported to accommodate the Clayton, Norris-LaGuardia, Wagner, and Sherman Acts."

laws even though this competition affects price competition among employers.[15]

The first case in which the Supreme Court began this modern attempt to harmonize the two conflicting policies was *Apex Hosiery Co. v. Leader*, (1940) 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, a case cited and followed in *Connell Co. v. Plumbers & Steamfitters*.[16] In *Apex* the Supreme Court held that no activity, whether by a union or anyone else, was within the proscription of the Sherman Act unless it had or was intended to have an effect on "commercial competition." It then proceeded to eliminate wage competition from the term "commercial competition," as used by it:

"[A]n elimination of price competition based on differences in labor standards is the objective of any national labor organization. *But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act.*" (Italics added)[17]

After thus exempting price competition arising out of the elimination of differences in wage rates from the type of competition contemplated under the antitrust prohibitions,[18] the Supreme Court one year later in *United States v. Hutcheson*, (1941) 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788, addressed more specifically the statutory exemptions in favor of labor organizations, saying:

"So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 [of the Clayton Act] are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means."[19]

■ However, in *Allen Bradley Co. v. Union*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939, the Supreme Court was confronted with the question of whether a labor organization committed an antitrust violation when, "in order to further their own interests as wage earners," it joined in a conspiracy of employers to monopolize and fix prices in an industry. In answering this question, the court said that a union may not, even though it is pursuing its own goals in so doing, "with impunity aid and abet business men who are violating the [Sherman] Act," for "Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to

---

15. *Connell Co. v. Plumbers & Steamfitters*, 421 U.S. at 622, 95 S.Ct. at 1835.

16. 310 U.S. at 503–04, 60 S.Ct. at 997–98.
   We date the "modern" attempt at reconciliation from the enactment of the Norris-LaGuardia Act which made obsolete much of the earlier decisions. *See Allen Bradley v. Union*, 325 U.S. at 805, 65 S.Ct. at 1538, Levy, *The Connell Construction Company Case: Antitrust Liability*, 5 *San Fernando Valley L. Rev.* 259, 271 (1976).
   In the Levy article, the author says:
   "The *Apex* decision came in 1940 when there were six new Justices on the Supreme Court appointed by President Roosevelt. This was the beginning of the reinterpretation of antitrust legislation and its impact on labor unions."

17. 421 U.S. at 636, 95 S.Ct. at 997–98.

18. *See Connell*, 421 U.S. at 622, 95 S.Ct. at 1835:
   "The nonstatutory exemption [for labor from the antitrust laws] has its source in the strong labor policy favoring the association of employees to eliminate competition over

wages and working conditions. Union success in organizing workers and standardizing wages ultimately will affect price competition among employees, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws."

19. 312 U.S. at 232, 61 S.Ct. at 466.
   *Cf. Connell*, 421 U.S. at 625, 95 S.Ct. at 1836. There, the court seems to hold that a "most favored nation" clause in a non-collective bargaining agreement with employers that restrains the "business market," as distinguished from the "wage market," is without labor's exemption, but suggests that, if the agreement is a part of a collective bargaining agreement, the result would not be the same. This appears to be the import of the following statement in the opinion:
   "There can be no argument in this case, whatever its force in other contexts, that a restraint of this magnitude might be entitled to an antitrust exemption if it were included in a lawful collective-bargaining agreement." Pp. 625–26, 95 S.Ct. p. 1836.

create monopolies and to control the marketing of goods and services." [20] In short, by joining in a business conspiracy by employers which is in violation of the antitrust laws the Union forfeits its right to shelter under labor's exemption and becomes liable with the employers under the antitrust laws. But, more importantly, as several commentators have emphasized, "What *Allen Bradley* holds is that the Union's liability under the antitrust laws in these circumstances, apart from any issue of exemption, arises out of its participation in a conspiracy intended to achieve a restraint of *commercial* competition by the business interests.[21]

It was against this background that the Supreme Court approached *Pennington*. The plaintiff therein was a small non-mechanized coal mining operator. His complaint was that the defendant Union had participated in an antitrust conspiracy by "join[ing] hands with organized business to drive marginal operators out of existence," [22] "all for the purpose of eliminating [such marginal operators] from the industry, limiting production and pre-empting the market for the large, unionized operators." [23] As a result of the conspiracy, he claimed his business had been destroyed. The action had arisen in the mid-1950's and in the early 1960's during the period of

large scale mechanization of coal mining. It was the plaintiff's theory that, in return for the agreement of the large operators to substantial wage increases in the collective bargaining negotiations, the Union agreed not to oppose mechanization and—critical to the action—had, in the collective bargaining negotiations during the period, undertaken at the behest of the multi-employer group, to impose on the marginal non-member operators such as the plaintiff the same substantial wage scales secured by it from the large, mechanized operators in order to eliminate these marginal producers as competitors in the commercial business of coal marketing. In pursuance of this agreement, the Union and the multi-employer group began a systematic pattern of wage increases which they knew the marginal operators such as the plaintiff could not meet and did this with the intent of driving these marginal operators out of business as competitors of the then-members of the multi-employer group. This obligation of the Union to impose a uniform wage scale on the industry *for these anti-competitive purposes* was allegedly formalized in a Protective Wage Clause (PWC) in the 1958 collective bargaining agreement negotiated between the Union and the multi-employer bargaining unit (BCOA).[24]

**20.** 325 U.S. at 808, 65 S.Ct. at 1539.

**21.** 325 U.S. at 807, 65 S.Ct. at 1539.

The holding in *Allen Bradley* was summarized by Professor Handler in *Recent Antitrust Developments—1965*, 40 *N.Y.U.L.Rev.* 823, 835 (1965):
"What would be an antitrust infraction for a group of employers acting in their capacity as competing sellers or buyers is not immunized by reason of labor's complicity."
For another summarization of *Allen Bradley* see Bernhardt, *The Allen Bradley Doctrine: An Accommodation of Conflicting Policies*, 110 *U.Pa.L.Rev.* 1094, 1107 (1962):
"The *Allen Bradley* doctrine is concerned with the labor exemption being used to shelter employer violations from the antitrust laws. Therefore, the employer participation in a conspiracy found to violate the antitrust laws under the doctrine must itself amount to a violation independently. *The employer activity must be of the kind that business interests would be likely to undertake in the absence of the union rather than mere coopera-*

*tion with the union in the achievement of typical Union goals.*" (Italics added)

**22.** *Mine Workers v. Pennington*, 381 U.S. at 674, 85 S.Ct. at 1596 (Douglas, J., concurring).

**23.** *See* Mr. Justice White's summarization of plaintiff's claim in 381 U.S. at 664, 85 S.Ct. at 1590.

**24.** The Clause was described in *Ramsey v. United Mine Workers of America*, (6th Cir.) 481 F.2d 742, a related case, as "the central legal document" in the case (481 F.2d at 752) and in *Solar Fuel Company v. United Mine Workers of America*, (W.D.Pa.1972) 346 F.Supp. 789, 792, aff'd. (3rd Cir.) 481 F.2d 1399, *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974), another like case, as "the heart of the matter."

The Clause provides:
"During the period of this Contract, the United Mine Workers of America will not enter into, be a party to, nor will it permit

Assuming that the Protective Wage Clause was to be deemed ambiguous, and assuming, when considered in the light of the circumstances of its adoption, that it did represent an absolute obligation by the Union to impose the wage scale set in the contract with the multi-employer group on all other employers, the legal questions

> any agreement or understanding covering any wages, hours, or other conditions of work applicable to employees covered by this Contract on any basis other than those specified in this Contract or any applicable District Contract. The United Mine Workers of America will diligently perform and enforce without discrimination or favor the conditions of this paragraph and all other terms and conditions of this Contract and will use and exercise its continuing best efforts to obtain full compliance therewith by each and all the parties signatory thereto."

This is in effect a "most favored nation" clause. The validity of such a clause, in the antitrust context, is covered in *Associated Milk Dealers, Inc. v. Milk Drivers U., Local 753*, (7th Cir. 1970) 422 F.2d 546, 554. Moreover a "most favored nation" clause, which is what the PWC was, is within the definition of a mandatory collective bargaining agreement. *Dolly Madison Industries*, (1970) 183 N.L.R.B. 1037. In this area of mandatory bargaining, the rule of exemption is especially appropriate. *See Meat Cutters v. Jewel Tea*, (1965) 381 U.S. 676, 689, 85 S.Ct. 1596, 1601, 14 L.Ed.2d 640:

> "Employers and unions are required to bargain about wages, hours and working conditions, and this fact weighs heavily in favor of antitrust exemption for agreements on these subjects."

**25.** In any antitrust suit against a labor organization, it is not sufficient merely to find that the activity of the labor organization was without the labor exemption; there must in addition be proof of an antitrust violation itself. This point was noted in *Apex* where the court said that "activities of labor organizations not immunized by the Clayton Act are not necessarily violations of the Sherman Act." 310 U.S. at 512, 60 S.Ct. at 1002.

Recently in *FMC v. Pacific Maritime Assn.*, (1978) 435 U.S. 40, 61, 98 S.Ct. 927, 939, 55 L.Ed.2d 96, the Supreme Court reiterated the same thought:

> "It is plain from our cases that an antitrust case need not be tried and a violation found before a determination can be made that a collective-bargaining agreement is not within the labor exemption, just as it is clear that denying the exemption does not mean that there is an antitrust violation."

The court then added as a footnote to this statement:

presented in the case were whether the action of the Union under the Clause would, first, be exempt from the antitrust law, and, if not exempt, under what circumstances, if any, would such action constitute an antitrust violation.[25] In deciding the case and in resolving these basic issues the court divided into three groups, each com-

> "In *Connell Construction Co. v. Plumbers & Steamfitters*, 421 U.S. 616 [, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), for example, the Court, after concluding that the agreement in question was not entitled to the nonstatutory labor exemption from the antitrust laws, remanded for consideration whether the agreement violated the Sherman Act. See also, *Meat Cutters v. Jewel Tea*, 381 U.S. 676, 688–689, 85 S.Ct. 1596, 1601–1602, 14 L.Ed.2d 640 (1965) (opinion of White, J.)" n. 19 at p. 61, 98 S.Ct. n. 19 at p. 939.

Kheel, *Labor Law*, § 48.03[3], 48–49, vol. 10 (1977), is to the same effect:

> "Two issues involving the labor exemption seem fairly well settled. First, loss of the exemption is not tantamount to a finding of antitrust liability. Once the exemption is lost, a separate determination of the alleged antitrust violation must be made in which the plaintiff is required to prove his case by a preponderance of evidence. Second, at least for purposes of the nonstatutory exemption, a claim of exempt status is not limited to a labor organization, i. e., an employer may assert the exemption."

In the Comment, *Antitrust Law—Most Favored Nation Clause and Labor's Antitrust Exemption*, 19 J.Pub.L., 399, 403, n. 29, the editor says:

> "Even when it is determined that a [most-favored nation] clause is beyond the scope of the exemption, it does not automatically follow that every case will result in an antitrust violation. That is to say, once an agreement is placed beyond the protection of the exemption, it remains to be proved that a violation has occurred; and in the *cases claiming an alleged conspiracy under the Sherman Act, predatory intent is an integral part of such proof.*" (Italics added)

*Levy*, 5 *San Fernando Valley Law Review* at 278 declares:

> "*Pennington*, however, required proof of predatory intent to find that a 'most favored nations' clause violates antitrust statutes."

And in *Embry-Riddle Aeronautical Univ. v. Ross Aviation, Inc.*, (5th Cir. 1974) 504 F.2d 896, 904, the court said:

> "In effect the court placed the exemption issue and the issue of liability on the merits before the jury under one instruction. Perhaps the preferable practice would be to separate them."

posed of three Justices. Mr. Justice White, who wrote what is generally referred to as the Court's opinion, spoke for one group. Mr. Justice Douglas, writing for another group, concurred in Mr. Justice White's opinion, but, in so doing, gave his construction of Mr. Justice White's opinion. Mr. Justice Goldberg, speaking for a third group, dissented by concluding generally that labor's exemption extended to any subject of mandatory bargaining in the collective bargaining process.

Mr. Justice White began his opinion by declaring that it was perfectly legitimate for a Union to "conclude a wage agreement with the multi-employer bargaining unit" and to seek "as a matter of its own policy, and not by agreement with all or part of the employers of that unit, . . . the same wages from other employers." [26] From this point in his opinion he proceeds by focusing primarily on the exemption question [27] and only incidentally on the issue of an antitrust violation. He held that "a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units." [28] He predicated such ruling on the reasoning that the Union, by such an agreement, gave up its freedom to bargain with other employers on terms different from those stated in the agreement. He seems to have accepted the district court's construction of the Protective Wage Clause as ambiguous on whether it imposed an obligation on the Union to compel all other employers in the industry with whom it bargained to comply with the wage scale as set forth in the multi-employer agreement and assumed that if it were construed as imposing such an obligation on the Union, the agreement by the Union to such a provision would be without labor's exemption. Having reached this conclusion, he then tersely turned to the second and crucial issue of an antitrust violation and said:

"One group of employers may not conspire to eliminate competitors from the industry and the union is liable [under the Sherman Act] with the employers if it becomes a party to the conspiracy. This is true even though the union's part in the scheme is an undertaking to secure the same wages, hours or other conditions of employment from the remaining employers of the industry." [29]

It is obvious that this latter declaration in Mr. Justice White's opinion on the issue of an antitrust violation is in effect a restatement of the ruling made in *Allen Bradley* and in his concurrence Mr. Justice Douglas, speaking for his group of three Justices, so construed Mr. Justice White's opinion ("As we read the opinion of the Court, it reaffirms the principles of *Allen Bradley Co. v. Union*, 325 U.S. 797 [, 65 S.Ct. 1533, 89 L.Ed. 1939] * * * "). On the basis of this construction, Mr. Justice Douglas then formulated the issue in the case to be submitted by an appropriate instruction at retrial.[30] He said:

---

**26.** 381 U.S. at 664, 85 S.Ct. at 1590.

**27.** He phrased the question presented by the appeal as follows:

"The question presented by this phase of the case is whether in the circumstances of this case the union is exempt from liability under the antitrust laws." 381 U.S. at 661, 85 S.Ct. at 1589.

He concluded his opinion with the statement:
"Thus the relevant labor and antitrust policies compel us to conclude that the alleged agreement between UMW and the large operators to secure uniform labor standards throughout the industry, if proved, was not exempt from the antitrust laws." 381 U.S. at 669, 85 S.Ct. at 1593.

The author of the Comment on *Connell* in 89 *Harv.L.Rev.* at 242, n. 63, offers a reason for this focus by Mr. Justice White on exemption by observing that this was the significant issue in the case since "[t]he district court provided the *Pennington* Court with an explicit finding that the union intended to drive out the smaller operators." This "explicit finding" was sufficient to establish a substantive antitrust violation (the second issue in the case), leaving only the issue of the applicability of the exemption (the first issue in the case).

**28.** 381 U.S. at 665, 85 S.Ct. at 1591.

**29.** 381 U.S. at 665–66, 85 S.Ct. at 1591.

**30.** The court ordered retrial for error in the instructions on an issue unrelated to those raised here.

"On the new trial the jury should be instructed that if there were an industry-wide collective bargaining agreement whereby employers and the union agreed on a wage scale that exceeded the financial ability of some operators to pay and that if it was made for the purpose of forcing some employers out of business, the union as well as the employers who participated in the arrangement with the union should be found to have violated the antitrust laws." [31]

Later in his opinion Mr. Justice Douglas, by way of further clarification, emphasized that the "purpose" requirement in his instruction consisted of both "knowledge" that the marginal operators "would be driven out of business" and "intent" to do so.[32]

Mr. Justice Douglas' construction of Mr. Justice White's opinion and his statement of the circumstances under which an antitrust violation against the Union could be found has been considered a proper summarization of the decision of the court in Pennington.[33] Without the concurrence of Mr. Justice Douglas and those Justices joining him, Mr. Justice White's opinion would have lacked

the necessary majority, and it was only the gloss put on it by Mr. Justice Douglas' opinion that gave it the required concurrence.[34] Because of this, Mr. Justice Douglas' construction of Mr. Justice White's opinion has been looked to as the authoritative expression of the conclusions reached by the majority in Pennington. This unquestionably was the view of the district court on remand in Pennington. Thus that court, after reviewing both Mr. Justice White's and Mr. Justice Douglas' opinions, said:

"Upon careful consideration, the Court has reached the conclusion that the Pennington case teaches that it is necessary to find predatory intent to drive small coal operators out of business in order to hold the employer and Union for a violation of the Sherman Act." [35]

That construction of Pennington, which in effect adopted the approach of Mr. Justice Douglas' concurring opinion, was approved on appeal to the Court of Appeals, and the dismissal of the antitrust claim was sustained,[36] (6th Cir. 1968) 400 F.2d 806,

**31.** 381 U.S. at 672–73, 85 S.Ct. at 1595.
This language in Mr. Justice Douglas' opinion caused the author Professor Meltzer in *Labor Unions, Collective Bargaining, and the Antitrust Laws*, 32 *U.Chi.L.Rev.* 659, 720–21, to comment:
"Thus, Mr. Justice Douglas' opinion rested explicitly on the existence of a predatory purpose."

**32.** 381 U.S. at 675, 85 S.Ct. at 1596.

**33.** *See Consol. Exp., Inc. v. N. Y. Shipping Assn.*, (3d Cir. 1979) 602 F.2d 494, 516; *Embry-Riddle Aeronautical Univ. v. Ross Aviation, Inc.*, 504 F.2d at 903; *Associated Milk Dealers, Inc. v. Milk Drivers U., Local 753,* (7th Cir. 1970) 422 F.2d 546, 554.

**34.** *See Consol. Exp., Inc. v. N. Y. Shipping Assn.*, 602 F.2d at 516.

**35.** *Lewis v. Pennington*, (E.D.Tenn.1966) 257 F.Supp. 815, 829.
This opinion of the district court has been summarized in the article by Di Cola, *Labor Antitrust: Pennington, Jewel Tea and Subsequent Meandering*, 33 *U.Pitt.L.Rev.* 705, 726 (1972):
"On remand the Pennington case was tried before District Judge Taylor, sitting without a jury. After reviewing the Supreme Court's

decision, Judge Taylor concluded that a finding of predatory intent to drive small coal companies out of business was necessary to hold the employer and union for a Sherman Act violation. He also emphasized that Mr. Justice White's second footnote indicated that the antitrust laws were 'not designed to protect marginal operators' and that 'ill effects alone on marginal operators [are] not enough to show intent.' Thus Judge Taylor adopted the Douglas 'reading' in Pennington with emphasis on the sufficiency of evidence relating solely to marginal producers' damages (White). The requirement of additional proof of predatory intent was crucial here in that the District Judge stated that the 'preponderance of proof' showed that all but one of the plaintiffs could not afford to pay the wages and royalties provided for in the 1950 industry-wide agreement as periodically amended. By centering his opinion on predatory intent, Judge Taylor managed to harmonize the White and Douglas opinions better than anyone could have expected."

**36.** The plaintiff in Pennington had stated a common-law claim under Tennessee law based on evidence of violence and intimidation by the Union. That claim was disposed of in 257 F.Supp. at 864, *et seq.* The damages awarded in those claims to the various plaintiffs were

814.[37] The circuit court, in thus sustaining the district court, said:

"We thus understand *Pennington* to teach that:

1) a conspiracy between employers and labor formed with the intention of driving competitors out of business is a violation of the Sherman Act;

2) 'predatory intent' (as used by Mr. Justice White (381 U.S. at 668, 85 S.Ct. 1585 [at 1592]) and by Judge Taylor) is merely shorthand, employed to describe this anti-competitive conspiracy; and

3) such an anti-competitive conspiracy must be established by 'clear proof.' "[38]

Subsequently in *Ramsey v. United Mine Workers of America*, (E.D.Tenn.1967) 265 F.Supp. 388, a case like *Pennington*, the Court was again called upon to determine whether "predatory intent" was an essential element in an action against a labor organization whose activities might not qualify for exemption under the Clayton Act. The district court seems to have so concluded.[39] Such decision was affirmed by an equally divided court in (6th Cir. 1969) 416 F.2d 655. Both groups in the circuit court filed opinions explanatory of their differences. The point of difference in the two opinions was limited strictly, as Judge O'Sullivan, speaking for those members who would reverse, made plain, to whether the requirement of "clear proof" under the Norris-La Guardia Act, 29 U.S.C. § 106, related to the evidence of an antitrust violation or simply to "the determination of the authority" of the individual union officers to act for the Union.[40] There was no conflict in the two opinions on the correctness of the construction given the *Pennington*

Supreme Court decision in *Lewis v. Pennington*, 400 F.2d at 813–14, *i. e.*, that a conspiracy of employers and labor "formed with the intention of driving competitors out of business" would be a violation of the Sherman Act, but that *without such "predatory intent" there could be no violation.* See 416 F.2d at 660–61, 663 (opinion of Judge Edwards) and 416 F.2d at 673 (opinion of Judge O'Sullivan). Judge Edwards also in his opinion went on to justify the court's reliance on its previous ruling in *Pennington II* that "predatory intent" was a requirement for an antitrust violation in that context. He said:

"The Supreme Court had granted certiorari in relation to this court's first decision in the same case [*i. e.*, *Pennington I*] and had remanded it with instructions for retrial. If the trial court, or this court, had interpreted those instructions erroneously in the course of retrial or appeal, we find it difficult to believe that the Supreme Court would have ignored the error." 416 F.2d at 661.

There was an appeal from this opinion of the divided court. The Supreme Court, in its opinion on appeal, directed its attention primarily to the measure of proof standard to be applied in the case, *i. e.*, whether "clear proof" or preponderance of evidence is required in sustaining a claim of conspiracy, and it was on this issue alone that the Supreme Court in that case divided. The Court, though, refused to decide, at the request of the plaintiff, that the language of the Protective Wage Clause (PWC) constituted a *per se* illegal conspiracy. The Court was also requested by the Union to reconsider its holding in *Pennington*. The Court refused to do so, but in so doing confirmed Mr. Justice Douglas' construction

---

affirmed in *Dean Coal Company v. United Mine Workers of America*, (6th Cir. 1970) 421 F.2d 1380.

**37.** *Certiorari* of that decision of the circuit court was *denied*, 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444, *rehearing* was *denied*, 393 U.S. 1045, 89 S.Ct. 616, 21 L.Ed.2d 599 (1969).

**38.** In *Ramsey v. Mine Workers*, 401 U.S. 311, 91 S.Ct. 664, the court found that "clear proof"

in the *Pennington* rule meant preponderance of the evidence. In the retrial of *Pennington* Judge Taylor had held that whether "preponderance" or "clear proof" was used the result would be the same.

**39.** 265 F.Supp. at 398–99.

**40.** 416 F.2d 661.

of the *Pennington* case as essentially a reaffirmation of *Allen Bradley*.[41] Thus Mr. Justice White, in denying the request, began by quoting from *Allen Bradley*:

"We know that Congress feared the concentrated power of business organizations to dominate markets and prices. . . . A business monopoly is no less such because a union participates, and such participation is a violation of the Act."

Mr. Justice White continued:

"Hence we also adhere to the decision in *Pennington*: '[T]he relevant labor and antitrust policies compel us to conclude that the alleged agreement between UMW and the large operators to secure uniform labor standards throughout the industry, if proved, was not exempt from the antitrust laws.' 381 U.S. at 669, 85 S.Ct. at 1593. Where a union, by agreement with one set of employers, insists on maintaining in other bargaining units specified wage standards ruinous to the business of those employers, it is liable under the antitrust laws for the damages caused by its agreed-upon conduct."[42]

That language, though not as clear as Mr. Justice Douglas' language in *Pennington*, leaves no room for doubt that there must be the anticompetitive purpose to "ruin" the small marginal competitors in order to establish an antitrust violation in the *Pennington*-type situation. Mr. Justice Douglas in his dissenting opinion in this case was similarly clear on the requirements for an antitrust violation under the circumstances relied on in that case. He stated the charge against the defendant in that case to be an agreement between the employer-group and the union "to force some (including petitioners) out of business," and "to impose a wage scale upon the total industry which had the purpose and effect of driving the small, marginal operators out of business." On the basis of these charges he concluded that only if it were established that the purpose of the agreement was "to do in one or more operators" was there an antitrust violation.[43]

On remand of *Ramsey* for retrial under the measure of proof standard established by the Supreme Court, the district court, on the basis of Mr. Justice White's language at 401 U.S. 313, 91 S.Ct. 665, quoted above, ruled:

"The foregoing language to which emphasis has been added would appear to have eliminated any need for proof of predatory intent, and to have established a per se rule of labor union antitrust liability *where it is made to appear by a proper standard of proof that the Union has agreed with one or more employers to maintain specified wage standards in negotiations with other employers and where such wage standards are shown to be ruinous to the business of the other employers.*" (Italics added) 344 F.Supp. 1029, 1033.

It will be noted that while the district court said that under its construction of *Ramsey*, it was unnecessary to prove "predatory intent" as an element of plaintiff's action, it did follow Mr. Justice White's language to the effect that, in order to make out an action, the plaintiff had to establish "by a proper standard of proof" two facts: *First*, "that the Union has agreed with one or more employers to maintain specified wage standards in negotiations with other employers," and *two*, that "such wage standards are shown to be ruinous to the business of the other employers." Implicit in these requirements is the necessity for finding that the agreement had an anti-competitive purpose, *i. e.*, to drive "the other employers out of business" for the benefit of the employer-parties to the agreement. As so construed the ruling of the district court is simply following the basic requirements of proof of a restraint of trade under Sections 1 and 2 of the Sherman Act. On appeal of this decision of the district court, the court of appeals affirmed, but in so doing it reiterated its prior conclusion in *Ramsey* that predatory intent (which in es-

---

**41.** 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939.

**42.** 401 U.S. at 313, 91 S.Ct. at 665.

**43.** 401 U.S. at 316, 317 and 320, 91 S.Ct. at 667, 667 and 668.

sence is no more than an anti-competitive purpose) is an essential element in a labor organization's antitrust liability.[44]

Subsequently, in *South-East Coal Co. v. Consolidated Coal Co.*, (6th Cir. 1970) 434 F.2d 767, the Sixth Circuit, confronted again with the problem of construing *Pennington* and *Ramsey*, summarized its view of those decisions as follows:

"Reviewing the *Ramsey* decision's interpretation of *Pennington*, four conclusions may be drawn applicable to the present dispute. First, the National Agreement containing the Protective Wage Clause is, on its face, a valid labor contract which seeks to implement the perfectly legal goals of uniformity of wages and working conditions. Second, if this agreement was made or entered into by the union in pursuance of its own self interests, there are no grounds for concluding a violation of the antitrust laws. Third, if, however, the employers and union entered into this contract with the conscious knowledge or intent that it would be used to drive competitors out of business (more than the incidental effects caused by the adoption of a uniform wage agreement which may result in certain operators not being able to function profitably), then a violation of the antitrust laws has occurred. Fourth, it is this either expressly or impliedly agreed-upon use of the valid contract, that is, that it will be used to drive competitors out of business, that comprises the agreement or conspiracy which is illegal for purposes of the antitrust laws. Without deciding the question of the legality of the '80-cent clause' suffice it to be said that these conclusions are also applicable to that provision." 434 F.2d at 782.

It also in this same case approved the following jury instructions given by the district court at trial:

"You are instructed that if you believe there was an industry-wide collective bargaining agreement, whereby employers and the union agreed on the wage scale that exceeds the financial ability, of some small operators, including the plaintiff, to pay, and that the agreement was made for the purpose of forcing some employers, including the plaintiff, out of business, or injuring its business, and you believe that the defendants, the Consolidation Coal Company and the United Mine Workers, deliberately entered into and participated in such an arrangement, and that the result of such an arrangement was the sole cause of damage, if any, to plaintiff, then you will find for the plaintiff." [45]

■ It would appear established beyond controversy by these Sixth Circuit decisions, particularly its last in *South-East Coal*, that for an agreement between the Union and the multi-employer group to constitute an antitrust violation it must arise out of a predatory intent, however it is described, whether, as Mr. Justice Douglas said, "to do in one or more competitors," or, as Mr. Justice White said, "with the purpose and effect of driving the small marginal operators out of business" or, as the plaintiff itself has expressed it, "with the purpose to eliminate competitors," or, again as Mr. Justice White has said, where the wage scales demanded are "ruinous to the business of the other employers." And this is the view of the *Pennington*-type case as phrased in other decisions and in the opinions of commentators. To repeat: it is not enough that the Union may have entered into a contract with a multi-employer unit in a national industry to establish an antitrust violation by the Union or, for that matter, the employer-group. That may in some cases take the action out of the exemption enjoyed by labor, but it will not *per se* amount to an antitrust violation. To amount to an antitrust violation the agreement must be rooted in an anti-competitive purpose, and must effect an anti-competitive result, as evidenced by action "ruining" a competitor's business or driving him "out

**44.** 481 F.2d at 755.

**45.** 434 F.2d at 783. The Supreme Court denied *certiorari* in this case, 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed.2d 149 (1971).

of business." Unless there is such an agreement between the labor organization and the non-labor group and such an anti-competitive result, there is no conspiracy actionable under the antitrust laws. The district court, however, seems to have found that *Tennessee Consolidated Coal Co. v. United Mine Wkrs. of Am.*, 416 F.2d 1192, was to the contrary and rested its conclusion that there was sufficient evidence of an antitrust conspiracy in this case to require the submission of that issue to the jury on its understanding of that authority, (*i. e., Tennessee Consolidated*). We think the district court misconstrued *Tennessee Consolidated.*

In *Tennessee Consolidated* the critical issue related to the Protective Wage Clause—whether it was sufficiently ambiguous to make its proper construction a question for the jury. The court did not deal with the issue of whether predatory intent was essential to a finding of an antitrust conspiracy in connection with an agreement between labor and non-labor groups or whether there was sufficient evidence in the case of predatory intent or intent to "ruin" marginal operators in order to reduce competition in the coal industry in that case. Apparently, the defendants in that case did not dispute that there was sufficient evidence of predatory intent, assuming the Protective Wage Clause was construed as plaintiff argued, to justify the submission of that issue to the jury. In submitting the issue to the jury it must be assumed that the district court followed the rulings of the Sixth Circuit in *South-East Coal, Pennington* (2d case), and *Ramsey* (2d case) that predatory intent was an essential element in plaintiff's claim of a right of action under the Sherman Act. This conclusion is fortified by noting the members of the panel in *Tennessee Consolidated.* They were Judges Weick, Peck, and Combs. Two of these judges (Judges Peck and Combs) had been members of the panel which ruled on *Lewis v. Pennington* in 400 F.2d 806, decided one year before *Tennessee Consolidated.* In *Lewis v. Pennington* there was no mistaking the position of the panel: It concluded unequivocally that "in-

tent to eliminate" a competitor or competitors and "predatory intent" were required for a finding of an antitrust conspiracy in a case just like *Tennessee Consolidated.* These same two members of the *Tennessee Consolidated* panel participated in the *en banc* rehearing in *Ramsey*, 416 F.2d 655, decided exactly seven days after *Tennessee Consolidated.* Both Judges Peck and Combs joined in Judge Edwards' opinion in *Ramsey I*, which reaffirmed unqualifiedly the decision in *Lewis v. Pennington* and, while Judge Weick joined in Judge O'Sullivan's opinion in *Ramsey I*, he did not do so because he thought the ruling in *Lewis v. Pennington* was wrong—in fact, Judge O'Sullivan accepted the binding character of *Lewis v. Pennington* just as Judge Edwards had done in his opinion, except on the one issue of measure of proof. It would be incomprehensible to assume that Judges Peck and Combs would have joined the opinion in *Tennessee Consolidated* if the latter opinion were different from *Lewis v. Pennington* in its holding on predatory intent as an essential element of an antitrust conspiracy in this context. We accordingly find nothing in *Tennessee Consolidated* inconsistent with the principle stated *supra* under which there must be some evidence that the intent of the Union's action was to "ruin" and to "drive out of business" the plaintiff and other marginal producers, in short, evidence of a predatory intent.

■ It is thus manifest from this review of the pertinent authorities applying the *Pennington* doctrine, on which the plaintiff relies for an antitrust conspiracy, that such doctrine requires (a) an agreement between the Union and an employer-group consisting of a substantial number of the larger employers in an industry to establish a wage scale for the employees-of-the-group-members-of-the Union, (b) which wage scale the Union and the employer group knew that the marginal employers in the industry could not afford, and (c) which wage scale the Union undertook to impose on the marginal nonmember operators, (d) with the intent to drive these marginal operators out of business and to remove

them as competitors of the employer-group. And this is the view of the Pennington model as taken in other decisions and as expressed by commentators.[46] Were the rule otherwise, labor organizations would be subject to liabilities greater than and different from those to which businesses would be subjected. Such a result would mock the congressionally granted exemptions in favor of labor organizations.

█ Under this construction of the Pennington line of cases, the first fact to be established by a plaintiff in its proof of an antitrust conspiracy is an agreement between the union and the employer-group to establish a wage scale which both knew the other employers, not members of the group, such as the plaintiff, could not meet. The record, however, is completely devoid of any evidence to support any such premise in this case. In fact, the evidence conclusively

demonstrates the contrary. The plaintiff all through its operations under the 1968 contract, for instance, paid the wages prescribed in that contract and at the same time earned a reasonable, if not an exorbitant, profit. Moreover, even as late as 1972 it sought to continue operations under the wage scale fixed in the 1968 contract. And in its development of its damage claim, it claimed that, working under the wage scale fixed in the 1968 agreement, it would have realized what many would have regarded as an excessive rate of profit. Nor did the plaintiff seek to offer any proof that it could not have operated profitably under the wage scale set in the new collective bargaining contract executed in November 1971. It did, it is true, profess such an inability in the late stages of the negotiations between it and the Union, but, when the Union requested an opportunity to veri-

---

**46.** *See Consol. Exp., Inc. v. N. Y. Shipping Ass'n.*, (3d Cir. 1979) 602 F.2d 494, 516; *Embry-Riddle Aeronautical Univ. v. Ross Aviation, Inc.*, (5th Cir. 1974) 504 F.2d 896, 903; *Associated Milk Dealers, Inc. v. Milk Drivers U., Local 753*, (7th Cir. 1970) 422 F.2d 546, 554; *Lewis v. Pennington*, (6th Cir. 1968) 400 F.2d 806, 814, *cert. denied*, 393 U.S. 983, 89 S.Ct. 450, 21 L.Ed.2d 444; St. Antoine, *Connell: Antitrust Law at the Expense of Labor Law*, 62 Va.L.Rev. 603, 613 (1976): Meltzer, *Labor Unions, Collective Bargaining, and the Antitrust Laws*, 33 U.Chi.L.Rev. 659, 720–21; Cox, *Labor and the Antitrust Laws: Pennington and Jewel Tea*, 46 Boston U.L.Rev. 317, 324 (1967); Comment, *Labor's Exemption from Federal Antitrust Law: The Diminishing Protection for Union Activities*, 28 U.Fla.L.Rev. 620, 629, n. 77; Comment, *Antitrust Law—Most Favored Nation Clause and Labor's Antitrust Exemption*, 19 J.Pub.L. 399, 403 (1970).

Thus Professor Cox in 46 *Boston U.L.Rev.* at 324, concluded discussion of *Pennington* with this observation, which is confirmed by later decisions and by the comments of other scholars:

"In the end, I think, the rule of the *Pennington* case will be confined to situations in which there is a rather specific agreement to put some of the employers in the industry out of business, established by something more than evidence that the union and signatory employers were aware that marginal operators could not afford to pay the union scale."

In the Comment to 28 *U.Fla.L.Rev.* at 629, the writer said:

"To find a conspiracy [by labor] with a non-labor group, the courts have consistently

required proof of predatory purpose or a design to injure or eliminate a competitor."

Dean St. Antoine in 62 *Va.L.Rev.* at 613 finds that

"In *Pennington* the key question was whether a labor agreement dealing with wages would violate the antitrust laws if its purpose was to put certain competitors out of business. The answer was 'yes'."

In *Embry-Riddle*, 504 F.2d 903, the court said:

"At least in cases falling within the *Pennington* model, for nonexemption and liability to be found the union must be proved to have had a purpose to injure or eliminate the competitor of a company whose employees it represents."

In *Associated Milk Dealers*, 422 F.2d 554, the court said:

"Therefore, a majority of the Supreme Court in *Pennington* requires proof of predatory purpose as a prerequisite to finding that a most favored nation clause violates the antitrust laws."

In *Consolidated Express*, 602 F.2d at 516, the court, after carefully reviewing *Pennington* and *Ramsey*, said:

"Since the three Justices who joined in the Douglas opinion would have upheld the union's claim of antitrust immunity absent a showing of predatory intent, and three others would have upheld the claim of immunity on broader grounds announced by Justice Goldberg, the Douglas opinion may well be read as limiting antitrust liability for agreements concerning subjects at the 'very heart' of the collective bargaining process to cases where predatory intent can be shown."

fy the claim by a review of plaintiff's records, the plaintiff refused, even though plaintiff was obligated under the National Labor Relations Act to extend to the Union the right to verify the employer's claim of financial inability.[47] The plaintiff's refusal supports the inference that the records would not support the claim, and the plaintiff's evidence in support of its damage claim fully supports the inference.

But the plaintiff not only fails to establish the first requirement of the *Pennington* model, it also fails to offer any credible evidence in support of the second requirement, *i. e.*, that the Union had agreed to *impose* any such wage scale on the plaintiff. In all the *Pennington* -type cases, proof of this element of the antitrust conspiracy rested basically on the Protective Wage Clause included in the 1958 contract. This Clause, however, was not included in the 1964 agreement between the Union and the employer bargaining unit, but, since the Clause was not expressly repudiated in the 1964 agreement, it has been held in at least one case that the Clause remained in effect.[48] It is this Clause which, as the Court said in *South-East*, is "the crux of the Union's illegal contract" in all these *Pennington* range of cases, representing the offensive agreement of the Union under the second requirement of *Pennington*. But in 1968 the parties expressly rescinded any prior Protective Wage Clause provision and absolved the Union of any obligation such as plaintiff had argued in the *Pennington*-type cases the Union had assumed.[49]

Since the plaintiff's claim relates to a period after its rescission, an express Protective Wage Clause cannot be relied on to establish any undertaking of the Union by agreement with the employer-unit to impose a wage scale on nonmember operators. The plaintiff contends that, though the parties had ostensibly rescinded the Protective Wage Clause, they covertly continued it in practice thereafter. The only evidence that the plaintiff can marshal in support of this claim that the Union was seeking to continue to compel, at the behest of the employer-group, all nonmember coal operators to conform to the wage scale incorporated in the contract with the multi-employer group is that the Union endeavored to induce all operators with whom it bargained to adopt the terms and conditions of the industry contract negotiated with the multi-employer group. The mere fact that the Union thus sought a uniform wage scale from all employers does not, however, show that such action was by agreement, either express or covert, with the employer-group. The Union had followed this practice from its earliest days as a Union. *Pennington* found such practice perfectly proper.[50] It was not, however, an inflexible practice by the Union. The Union—at least, local units of the Union—agreed to variations in the wage scale in agreement with individual operators. It was because of the frequency of this practice that the employer-group demanded the inclusion of the Protective Wage Clause in the 1958 agreement: The employer-group wanted a specific agreement to protect its members from this prac-

---

**47.** *See* Note 7 *supra*.

**48.** *Solar Fuel Company v. United Mine Workers of America*, (W.D.Pa.1972), 346 F.Supp. 789, 794–95, aff'd., 481 F.2d 1399 (3rd Cir. 1973), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974).

**49.** *See Solar Fuel Company v. United Mine Workers of America*, 346 F.Supp. at 794–95. Section A of the Protective Wage Agreement is as follows:

"During the period of this Contract, the United Mine Workers of America will not enter into, be a party to, nor will it permit any agreement or understanding covering any wages, hours or other conditions of work applicable to employees covered by this Contract on any basis other than those specified in this Contract or any applicable District Contract. The United Mine Workers of America will diligently perform and enforce without discrimination or favor the conditions of this paragraph and all other terms and conditions of this Contract and will use and exercise its continuing best efforts to obtain full compliance therewith by each and all the parties signatory thereto."

**50.** 381 U.S. at 664–65, 85 S.Ct. at 1590.

tice.[51]   Moreover, while the Union sought such uniformity in its negotiations in 1971 it was willing to make variations from such uniform scale, as it demonstrated in this case when it offered, if the plaintiff could show financial hardship, to renegotiate the wage scale.   All these undisputed circumstances negatived entirely any possibility of a continued covert unwritten agreement between the Union and the employer-group on a Protective Wage Clause.

Finally, even were there some evidence of a continued covert Protective Wage Clause it certainly was not intended as a method of driving the plaintiff out of business.   Thus there was a complete absence of predatory intent on the part of the Union.   The wage scale offered the plaintiff by the Union was one that the plaintiff could meet, as we shall develop at some greater length later. The plaintiff's reason for abandoning the mines on Peabody's land was not due to the exactions of the wage scale in the 1971–72 contract.   It abandoned the operations because of the strike on October 1, 1971, and, according to its evidence, because of the start-up expenses for reopening the mines at the termination of the strike.

As a matter of fact this case is simply not a *Pennington*-type case at all.   It satisfies none of the criteria for such a case.   Neither can the plaintiff find any support for its cause of action on the basis of any of the *Pennington* cases.   In finding that it was a *Pennington*-type case, the district court misconceived the essential elements of such a case and failed to note the absence of such elements here.   What the plaintiff is complaining of is not a conspiracy between a labor organization and a non-labor group. It suffered no injury and can claim no wrong on account of the 1968 agreement between the Union and the multi-employer-group.   What it really complains of begins with the strike on the part of the Union at midnight on September 30, 1971.   This unilateral action of the Union—taken without collaboration with any outside group and certainly not at the behest of the multi-employer group—is the beginning point of

plaintiff's claim.   And all other claims by the plaintiff flow from this event.

■   The plaintiff's real plaint is that the Union had no right to strike against it on September 30, 1971.   It bases this position upon the provision in the 1968 contract which authorizes either party on sixty days' notice in writing prior to September 30 to terminate the contract.   The plaintiff says it received no such notice, even though it did know that the Union intended to strike on September 30 and had given notice to other signatories of the contract.   Assuming that the Union had failed to give the plaintiff the required notice of termination of the contract on September 30 and that the strike was a breach of the Union's agreement with the plaintiff, the latter might have had a remedy against the Union under Section 303 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 187, see *Riverton Coal Co. v. United Mine Workers of America*, (6th Cir. 1972) 453 F.2d 1035, *cert. denied*, 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690, but certainly not a remedy under the antitrust laws, *Larry R. George Sales Co. v. Cool Attic Corp.*, (5th Cir. 1979) 587 F.2d 266, 274; *Salerno v. American League of Prof. Baseball Clubs*, (2d Cir. 1970) 429 F.2d 1003, 1004, *cert. denied*, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971); *McAlpine v. AAMCO Automatic Transmissions, Inc.*, (E.D.Mich. 1978) 461 F.Supp. 1232, 1264; *see also Gateway Coal Co. v. Mine Workers*, (1974) 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583.

■   The argument is also made that the Union while engaged in a strike refused to negotiate with the plaintiff between October 1 and November 16, and that this represented an antitrust conspiracy.   As a factual basis for this claim the plaintiff points to its interview with its employees on September 30, when Baker, its operating head, requested the employees not to strike on the next day, promising in turn that he would sign on the plaintiff's behalf a stipulation to be bound retroactively to October 1 by any wage provisions which might be

---

**51.**   *See Lewis v. Pennington*, 257 F.Supp. at 824.

agreed upon as a result of the negotiations between the Union and the multi-employer group. By this statement the plaintiff expressed no desire to negotiate a full collective bargaining contract; it recognized it was beyond its competency to deal adequately with the whole range of working conditions to be embraced in a complete collective bargaining agreement. What it was actually requesting of the Union was that the Union members continue to work in its mines with only an agreement on wage rates to be later negotiated and without any other agreement; in short, it was asking the Union to abandon its traditional rule of "no contract, no work." The Union refused. In refusing to negotiate such a contingent agreement with the plaintiff and in delaying to request negotiations with the plaintiff until November 16, the Union was not acting in concert with any non-labor group, but was, as the district court aptly remarked, attempting in its own interest and in that of its members to protect "[t]he integrity of a nationwide industry strike." [52] It may be that it did prefer to proceed first to negotiate with the multi-employer group but, if it did, this was its right, as Mr. Justice White had declared in *Pennington*. Again, this, however, was a unilateral decision of the Union, taken in what it conceived to be the interests of its members, and could not support an antitrust claim.

After November 16 the plaintiff was offered a contract by the Union (UMW). The plaintiff offered no objection to the contract or any of its provisions on that date. It made no request for changes. It simply said it was prevented from signing the contract because it had the day before signed a contract with another Union. By signing that contract with another Union (SLU)—a voluntary act on the part of the plaintiff—it disqualified itself, in its view, from negotiating with the UMW, though apparently

UMW continued to represent a majority of plaintiff's employees. When later an unfair labor charge against the plaintiff arising out of plaintiff's contract with the other Union (SLU) was dismissed, the plaintiff again dallied about negotiating a contract with UMW, asserting that it had to have *written* confirmation from the National Labor Relations Board of the dismissal. A little later when pressed by UMW to negotiate, the plaintiff, having employed the counsel who had handled the *Pennington* case and the other cases it spawned, first asserted as an excuse. for not signing the UMW contract that it could not afford the wage scale in the new contract. The UMW countered this claim with a request to see the plaintiff's books [53] and, when refused, offered to renegotiate the agreement if, after the reopening of the mines, the plaintiff contended it could not operate profitably under the agreement. At this point the plaintiff would argue that the representative of the Union, with whom it had been dealing for some weeks, was without authority to bind the Union. It is obvious that this whole record is more an indication of dalliance on the part of the plaintiff than by the Union; but, irrespective of which party dallied, such dalliance would not be an antitrust violation.

█ Though the plaintiff did not assert it at the time as a ground for objecting to the 1971 contract, the Coal Lands Clause in that contract (as well as in the 1968 contract) is cited now as infecting both the 1971 and 1968 contracts with an obligation, not on the Union as in the Protective Wage Clause, but on the employers, as a mechanism employed by the parties to those agreements to effect an antitrust violation. Presumably this is now asserted as a ground for the plaintiff's failure to agree to the 1971 contract. The Coal Lands Clause in one form or another, however, has been

---

**52.** The district court said:

"Plaintiff can scarcely be heard to argue that the UMW's refusal to allow plaintiff to continue to operate, under a mere stipulation to be retroactively bound to the new agreement, was a manifestation of a conspiracy to drive

small operators out of business. The integrity of a nationwide industry strike could not be maintained if such variations were allowed to prevail." 457 F.Supp. at 1133.

**53.** *See* Notes 7 and 47 *infra*.

incorporated in every UMW contract since 1943, when the War Labor Board ordered its inclusion in all collective bargaining agreements in the coal industry.[54] Such a Clause is within the scope of mandatory collective bargaining.[55] It is not tainted by any requirement which would limit the rights of the Union in its bargaining with other parties—the point which Mr. Justice White found might be inherent in the PWC if that Clause were properly to be construed as limiting the power of the Union to negotiate with other employers than those in the multi-employer group. Nor was the Coal Lands Clause intended to do other than to protect the legitimate interests of the Union; it was not at all an attempt, in concert with the multi-employer group, to "ruin" any party's business or to drive such party out of business. Devoid of any predatory purpose, intended only to serve the legitimate interests of the Union's constituency, and binding only the parties themselves, the Coal Lands Clause is insufficient as a matter of law to support an antitrust action by the plaintiff, particularly since there is no showing whatsoever that the plaintiff was ever frustrated in its business by such Clause.[56]

It is of interest that the plaintiff in *Pennington* raised this same issue of the Coal Lands Clause as well as the Eighty Cent Clause but appears to have abandoned it on appeal, prompting this comment by the Court of Appeals in the second appeal of *Pennington*:

"However, plaintiffs do not on this appeal advance a claim of a concerted refusal to deal, and a review of the record in light of the District Court's finding concerning these clauses (*i. e.*, the Coal Lands Clause and the Eighty Cent Clause) (257 F.Supp. at 862) demonstrates that no Sherman violation could be founded on those clauses under *Hutcheson* . . . and *Allen Bradley* . . . ."[57]

■ The same situation prevails in this case and warrants the same disposition as was given the clause in *Lewis v. Pennington*. Moreover, what has been said about the Coal Lands Clause is equally applicable to the Eighty Cent Clause, a provision also dealt with in *Lewis v. Pennington* adversely to any claim by the plaintiff here. It should further be noted that the plaintiff can base no claim on this Eighty Cent Clause because it makes no allegation that it intends to buy coal from others and thus is prejudiced by this Clause in that it was ever frustrated in its sales by the Clause. In effect the Eighty Cent Clause has no real place in this case.

■ After all is said and done and after *Pennington* and all its brood are carefully reviewed, the fact remains that what the plaintiff is complaining of is that the Union struck its mines in October and that, until there was some agreement, it had refused to agree for its members to engage in maintenance work in the plaintiff's mines, as a result of which it was not able to continue

54. *See Lewis v. Pennington*, 257 F.Supp. at 824:

"A 1943 order of the National War Labor Board directed that each UMW contract include a provision relating to leased mines, that 'Operators agree that they will not lease any operating mines subject to this Agreement as a subterfuge' to avoid the Agreement's provisions. This clause by reference was contained in the Ickes-Lewis Agreement in 1943 and in the National Bituminous Coal Wage Agreement of 1945. The 1952 Agreement provides that operators 'agree that they will not lease out any coal lands as a subterfuge for the purpose of avoiding the application of this Agreement.' It expresses a covenant which the basic agreement would in any event imply."

In all the Agreements, including the 1968 and 1972 Agreements, the application of the Clause is always limited to the use of the lease as a "subterfuge to avoid the application of the collective bargaining agreement."

55. *See* Note 24 *supra*.

56. *Cf. Allen Bradley*, 325 U.S. at 809, 65 S.Ct. at 1539, where the Court assumed that an agreement "not to buy goods manufactured by companies which did not employ the members of Local No. 3. . . . standing alone would not have violated the Sherman Act."

57. 400 F.2d at 813.

the operation of its mines. That and that only is what this suit is about. That and that alone represents the events which caused such injury as the plaintiff asserts. For those acts, however, there can be no antitrust liability on the part of the Union. They represent actions taken unilaterally by the Union, without consultation or by agreement with the employer-unit, solely with a view to the interests and legitimate objectives of its members. There was no combination with employers in either the strike or in the refusal to allow maintenance work in the plaintiff's mines. Moreover, both of these actions were protected by labor's statutory exemption.

We conclude that on this record there was insufficient evidence of an antitrust conspiracy on the part of the defendant to permit the submission of that issue to the jury, and the district court should have so ruled. Even were this not so, the plaintiff failed in its proof to offer sufficient evidence of damages by reason of any conduct of the Union for the reasons stated by the district court in its detailed analysis of the evidence.

The grant of judgment n.o.v. by the district court is affirmed both for the reason stated by the district court and for the failure of the plaintiff to adduce sufficient proof of an antitrust violation to permit the submission of such issue to the jury.

The judgment of the district court is accordingly

*AFFIRMED.*